[This opinion has been published in *Ohio Official Reports* at 84 Ohio St.3d 180.]

THE STATE OF OHIO, APPELLEE, *v*. GETSY, APPELLANT.

[Cite as *State v. Getsy*, 1998-Ohio-533.]

*Criminal law—Aggravated murder—Duress cannot be asserted as a defense to aggravated murder under R.C. 2903.01(A)—Death penalty upheld, when.*

Duress cannot be asserted as a defense to aggravated murder under R.C. 2903.01(A).

(No. 96-2346—Submitted July 15, 1998—Decided December 23, 1998.)

APPEAL from the Court of Common Pleas of Trumbull County, No. 95-CR-399.

_____

{¶ 1} Appellant, Jason A. Getsy, was convicted of the aggravated murder of Ann R. Serafino and the attempted aggravated murder of her son, Charles Serafino, and sentenced to death. He appeals his convictions and death sentence.

{¶ 2} Charles ("Chuckie") Serafino lived with his mother, Ann Serafino. On the evening of July 6, 1995, Ann went to bed at approximately 11:00 p.m. Chuckie was on the love seat in the family room when, sometime after 1:00 a.m. on July 7, he heard a loud explosion. Shells from a shotgun blasted out the sliding glass door behind him and wounded him in the arm. As he ran for the bathroom to inspect his injuries, Ann came out of her bedroom. Chuckie remembered hearing his mother say to someone, "What are you doing here? Get out of here." He also remembered hearing someone say, "Shoot the bitch," or "Kill the bitch." Serafino next recalled seeing a gun in his face and being shot again. He fell to the bathroom floor and pretended to be dead. After the intruders left, he called 911.

{¶ 3} Frederick Hanley, Jr., Chuckie's neighbor, jumped from his bed upon hearing gunshots. He looked at his digital alarm clock, which read 1:22 a.m. As he was going downstairs, he heard at least one additional gunshot. Once outside, he heard footsteps that appeared to be running away from the Serafino residence.

He instructed his wife to call 911 and inform the police that shots were coming from the Serafino residence and that someone was running towards the city of Hubbard.

{¶ 4} Officer Thomas Forgacs of the city of Hubbard Police Department was one of the first officers to respond to the call. The officers broke into the Serafino home and found Chuckie lying on the floor with blood all over him. Chuckie asked the officers to check his mother; she was dead.

{¶ 5} Forgacs left the scene and began checking the Hubbard area for a white Crown Victoria owned by John Santine. Forgacs went to 24 ½ South Main Street, where he had seen Santine's car parked on the evening of July 6. He found Santine's car parked in the driveway with another car pulled in behind it.

{¶ 6} Earlier in the year, Santine had attempted to purchase a portion of Chuckie Serafino's lawn-care business and had deposited $2,500 in the business's account. Subsequently, Chuckie violated probation and was incarcerated in the Trumbull County Jail until July 6, 1995. While Chuckie was in jail, Santine attempted to take over Chuckie's business. Santine transferred Chuckie's building lease and equipment into his own name, which caused an altercation between Santine and Ann Serafino and Chuckie's sister. The Serafinos filed a civil action against Santine while Chuckie was still in jail.

{¶ 7} Forgacs searched for Santine's car because of a conversation he had had on June 20, 1995 with Richard McNulty. McNulty, who lived at 24 ½ South Main and who is a co-defendant, had previously served as a police informant. On June 20, Forgacs asked McNulty, who worked for Santine, "What does Johnny have in store for Chuckie when he gets out of jail?" McNulty told Forgacs, "He's dead. He's bought and paid for." McNulty told Forgacs that Santine had lined up a hit man, Tony Antone, to kill Chuckie Serafino. Forgacs gave little credence to McNulty's statements, and didn't inform Chuckie or follow up on the information.

**{¶ 8}** Forgacs returned to the murder scene and told the Hubbard Township Police what McNulty had told him a few weeks earlier. Later that morning, Detective Donald Michael Begeot of the Hubbard Township Police Department and Forgacs went to the McNulty apartment at 24 ½ South Main to take McNulty in for questioning.

**{¶ 9}** Initially, McNulty minimized his involvement and denied that he had told Forgacs about the contract on Chuckie. Based on other information obtained from McNulty, Begeot obtained an arrest warrant for Getsy. At approximately 10:00 p.m. on July 7, 1995, Getsy was arrested in the driveway of 24 ½ South Main. He was given *Miranda* warnings at the scene and later at the Hubbard Township Police Department. At approximately 1:00 a.m., on July 8, 1995, Getsy gave a videotaped interview.

**{¶ 10}** Getsy told Begeot that Ben Hudach called him on the evening of July 6, 1995, and told him to come to 24 ½ South Main Street. When Getsy got there, Hudach, a co-defendant, told Getsy that they (Getsy, Hudach, and McNulty) had to "take out some guy." Santine was not present, but Hudach related what Santine had told him earlier. Money had been discussed, but Hudach was not sure of the amount. Getsy later indicated that he participated in the shootings because he was scared of Santine, but did not do it for the money.

**{¶ 11}** Sometime on July 6, 1995, Getsy, Hudach, and McNulty drove to the Serafino residence. They could not find a place to park so they returned to 24 ½ South Main Street. When they returned, Santine was at the apartment and drove them back to the Serafino house. Getsy described the guns that they took with them, which included a shotgun, a SKS rifle, and a .357 magnum handgun.

**{¶ 12}** Getsy explained that after Santine dropped them off, Hudach sprained his ankle and went back to where they were supposed to be picked up. Getsy stated, "[T]hat left me and Rick to get it done." He admitted that what they were supposed to do was kill Chuckie Serafino.

{¶ 13} Getsy explained that he and McNulty fired simultaneously through the sliding glass door on the back of the Serafino house. They entered the house through the shattered door and shot at Chuckie as he was running down the hall. When they saw Ann Serafino, Getsy stated, they "just kept shooting."

{¶ 14} During the interview with Begeot, Getsy was reluctant to mention Santine's name. He told Begeot that the same thing that happened last night could happen to him. He asked whether Santine would ever see the interview tape. Begeot assured Getsy that Santine would not be able to get to him. Getsy also asked Begeot if he was going to die, and Begeot told him, "No."

{¶ 15} Getsy admitted that he had the SKS rifle and the handgun during the shootings. He explained that when he was shooting the SKS, the clip fell out so he had to pull out the handgun.

{¶ 16} Getsy's description of the weapons he and McNulty used was verified by physical evidence recovered at the scene. Michael Roberts, a forensic scientist, identified the projectiles recovered from the murder scene. None of the projectiles found outside the family room area, where the sliding glass door was blown out, was discharged by the shotgun which, according to Getsy, McNulty carried and fired. The projectiles linked to the shotgun were recovered in the family room.

{¶ 17} Getsy admitted that they had been instructed to kill any witnesses. When Begeot asked him what they were told about witnesses in the house, Getsy replied, "[I]f we were seen, to do them, too."

{¶ 18} After the shootings, Hudach called Santine to tell him it was finished and to pick them up. Santine told Hudach that there were cops everywhere and that they should run through the woods to get back to the apartment. Santine also told Hudach to ditch the guns in the woods.

{¶ 19} Getsy, McNulty, and Hudach arrived back at 24½ South Main, where Josh Koch and Santine were waiting for them. Santine ordered them to take

off their clothes and take a bath. Getsy was the last to bathe. When he came out of the bathroom, his clothes and boots were gone. He did not know what happened to them.

{¶ 20} Koch testified that he was at 24 ½ South Main Street on July 6 and 7, 1995. He knew that Getsy, McNulty, and Hudach were going out to do something for Santine, but they declined to give him any details. He was to watch TV and write down the shows that were on so the other three could memorize the list for an alibi.

{¶ 21} After Getsy, McNulty, and Hudach left, Koch waited in the apartment. Santine came to the apartment and, sometime around 1:00 a.m., jumped up and said, "I heard the gunshots." Immediately thereafter, the telephone rang and Koch heard Santine talking to someone in a fast, excited manner. Santine said, "So you killed them, right, you killed them both? * * * Okay. Well, I can't come pick you up. The cops are everywhere, they are pulling over everybody, you got to run through the woods and ditch the guns." Santine hung up and happily screamed, "I fucking love these guys."

{¶ 22} According to Koch, Santine was very pleased with the three men. He said, "You guys want $10,000? I'll give you $10,000." McNulty told him he just wanted a wedding ring for his girlfriend. Hudach said that it had been a favor for Santine. Getsy indicated that he needed money for his car.

{¶ 23} The next day, Koch heard Getsy bragging to Patricia Lawson about shooting Ann Serafino. Getsy grabbed a piece of pizza with no cheese on it and said, "This looks just like this bitch's face after we shot her."

{¶ 24} Michael Dripps, a close friend of Getsy, McNulty, and Hudach, acknowledged that Getsy was happy, secure, and tough when he had a gun in his hand. Dripps was present at the lawn-care business when Gum-out had been used to wipe prints off the weapons before the Serafino shootings. Dripps heard Santine instruct Getsy, McNulty, and Hudach to kill Chuckie Serafino and all witnesses.

Dripps also observed McNulty and Hudach in camouflage clothing on the night of the killing.

{¶ 25} The Trumbull County Grand Jury indicted Getsy for the attempted murder of Charles Serafino, conspiracy to commit aggravated murder, aggravated burglary, and two counts of aggravated murder, with capital specifications for the death of Ann Serafino.

{¶ 26} The jury found Getsy guilty of all charges.  After the trial, the state moved to dismiss the conspiracy count, which was granted, and elected to go forward with an aggravated murder charge based on prior calculation and design. After a sentencing hearing, the jury recommended that the death sentence be imposed.  The trial court adopted the recommendation and sentenced Getsy to death.

{¶ 27} The cause is now before this court upon an appeal as of right.

_____

*Dennis Watkins*, Trumbull County Prosecuting Attorney, *LuWayne Annos* and *Cynthia W. Rice*, Assistant Prosecuting Attorneys, for appellee.

*David C. Stebbins* and *David L. Doughten,* for appellant.

_____

**PFEIFER, J.**

{¶ 28} In this appeal, Getsy raises seventeen propositions of law, many with subparts. For the reasons that follow, we reject all his propositions of law and affirm each conviction and the death sentence.

*TRIAL JUDGE'S FAILURE TO RECUSE HIMSELF*

{¶ 29} Getsy's jury trial began on August 5, 1996, and was presided over by Judge W. Wyatt McKay.  On August 22, 1996, the Trumbull County judges held an annual picnic at the home of Judge Ronald Rice's mother.  Judge Rice's wife is Cynthia Rice, the assistant prosecuting attorney who was trying Getsy's case.  Both Judge McKay and Rice attended the picnic.  Following the picnic, Judge McKay

was in a single-car accident and was charged with driving under the influence of alcohol.

{¶ 30} On August 26, 1996, Getsy filed a Motion for Mistrial and a Motion for Recusal in the trial court. He also filed an Affidavit of Disqualification against Judge McKay in this court. The motions alleged that the judge was socializing with the prosecutor, thereby giving the appearance of impropriety. Getsy also asserted that the judge showed up at the trial on August 23, 1996 with bruises and sunglasses on his face, and that the trial continued on August 23, as normal, without any mention of the picnic or the accident.

{¶ 31} On August 27, 1996, the Chief Justice denied the Affidavit of Disqualification. *In re Disqualification of McKay* (1996), 77 Ohio St.3d 1249, 674 N.E.2d 359. "The mere fact that a judge and an attorney attend the same social event does not mandate the judge's disqualification from pending cases involving that attorney. * * * The record is devoid of any evidence that demonstrates the existence of any bias, prejudice, or disqualifying interest based on the claims of the affiants." *Id.* at 1250, 674 N.E.2d at 359.

{¶ 32} After the Chief Justice denied the application, Judge McKay brought in a fellow judge from Trumbull County to voir dire the jurors regarding the media coverage of his (Judge McKay's) arrest. Only two jurors had seen the article; both indicated that it would not affect their decision in Getsy's case. All jurors indicated that they could be fair and impartial to both parties. Judge McKay denied the motion for mistrial and the motion for recusal.

{¶ 33} In his first proposition of law, Getsy challenges the Chief Justice's ruling on the affidavit as well as the trial court's denial of the recusal and mistrial motions.

{¶ 34} R.C. 2701.03 allows a party to file an affidavit of disqualification with this court when a common pleas court judge is allegedly biased against a party or counsel. The filing of the affidavit of disqualification precludes the trial judge

7

from conducting any further proceedings until the Chief Justice rules on the affidavit. R.C. 2701.03(D)(1). Accordingly, when counsel for Getsy filed the affidavit of disqualification in this court, all proceedings were stayed, including the motion for recusal and the motion for mistrial.

{¶ 35} Once the Chief Justice denied the affidavit, Getsy's motion for recusal became moot. Further, based on the voir dire of the jurors, the trial court was correct in denying the motion for mistrial.

{¶ 36} In *State v. Rogers* (1985), 17 Ohio St.3d 174, 185-186, 17 OBR 414, 424-425, 478 N.E.2d 984, 995, this court found that when the Chief Justice dismisses an affidavit of disqualification as not well taken, "the Chief Justice's ruling is *res judicata* as to the question." The first proposition of law is overruled.

## INEFFECTIVE ASSISTANCE OF COUNSEL

### Conflict of Interest

{¶ 37} Getsy argues in his second proposition of law that trial counsel had a conflict of interest and therefore that he was denied his Sixth Amendment right to counsel. Getsy asserts that a conflict existed because Maridee Costanzo, who was hired by Getsy's father to represent Getsy, was also a contract lawyer for the Trumbull County Office of the Ohio Public Defender. Richard McNulty, a co-defendant, was represented by the Director of the Trumbull County Office and another assistant public defender.

{¶ 38} After Getsy was arrested, he filed an affidavit of indigency and counsel were appointed. On January 5, 1996, Maridee Costanzo filed an appearance of counsel. A motion to continue the trial was also filed, and the court held a hearing. At the hearing, the trial judge stated that Getsy had hired attorney Costanzo and no longer wished to have attorney Thomas Schubert represent him. Getsy requested that appointed counsel, John Shultz, continue his representation.

{¶ 39} Attorney Costanzo stated that she had been hired by Getsy's father, that Getsy retained his indigent status, that she was qualified under former

C.P.Sup.R. 65 (now Sup.R. 20), and that she would serve as co-counsel with Shultz and seek no compensation from the county for her services. The court appointed her as second chair, with Shultz retaining lead counsel status; Schubert was removed from the case.

{¶ 40} The prosecutor asked whether a possible conflict existed, since Costanzo was a part-time public defender and the public defender's office represented a co-defendant. Costanzo indicated that she had explained the situation to Getsy. The trial court questioned Getsy about the possible conflict. Getsy stated that he fully understood the situation, had no questions, and was satisfied with his counsel. Costanzo stated for the record that she had had no contact of any kind with the McNulty case.

{¶ 41} Two months later, the trial court learned that Costanzo was not certified under C.P.Sup.R. 65 to represent indigent persons charged with capital crimes. The court appointed James Wise to serve as co-counsel. From that point, Getsy was represented by three attorneys. Getsy now argues that "Ms. Costanzo was permitted to continue on the case despite the fact that she was not qualified under Rule 65 * * *." While true, this argument is irrelevant. Costanzo was retained, not appointed, and retained counsel need not be qualified under C.P.Sup.R. 65. *State v. Keith* (1997), 79 Ohio St.3d 514, 534, 684 N.E.2d 47, 65-66.

{¶ 42} Getsy argues that his Sixth Amendment rights were violated because the trial court failed to inquire concerning the fact that James Lewis, McNulty's attorney, was Costanzo's supervisor. Getsy argues that the conflict "became real and insurmountable" during the course of the trial because one of the issues in the case was whether Getsy or McNulty was the "actual killer." Getsy's arguments do not accurately portray what occurred during the course of the trial.

{¶ 43} For example, Getsy argues that McNulty's videotaped statement was improperly played for the jury. Getsy fails to mention that the defense played the

statement during the penalty phase, attempting to show that McNulty was untruthful because he made four different statements to the police.

{¶ 44} Getsy also argues that a conflict existed because Lewis, McNulty's attorney and Costanzo's supervisor, was a witness in the penalty phase and was questioned by Costanzo. However, the defense called this witness and there is no indication in the record that Costanzo did not adequately question Lewis. The Lewis testimony was of some benefit to Getsy because Lewis discussed the plea bargain that McNulty received. Thus, the jury was aware that McNulty had an interest in placing the blame on Getsy and that Getsy was the only co-defendant who would be subjected to the death penalty.

{¶ 45} Getsy argues that an on-the-record hearing would have enabled him to understand the nature of the conflict and to intelligently decide how to proceed. When Costanzo sought to enter an appearance in the case, the risk of a possible conflict was raised and discussed on the record, and Getsy chose to go forward with her representation. Although the fact that Lewis was Costanzo's supervisor was not discussed, that single fact is not so significant that it outweighs the remaining disclosure and waiver.

{¶ 46} "In order to establish a violation of the Sixth Amendment, a defendant * * * must demonstrate that an *actual conflict* of interest *adversely affected* his lawyer's performance." (Emphasis added.) *Cuyler v. Sullivan* (1980), 446 U.S. 335, 348, 100 S.Ct. 1708, 1718, 64 L.Ed.2d 333, 346-347. A possible conflict is insufficient. *Id.* at 350, 100 S.Ct. at 1719, 64 L.Ed.2d at 347. " 'The term "conflict of interest" bespeaks a situation in which regard for one duty tends to lead to disregard of another. The obvious example of this is representation of clients with incompatible interests.' * * * A lawyer represents conflicting interests when, on behalf of one client, it is his duty to contend for that which duty to another client requires him to oppose." *State v. Manross* (1988), 40 Ohio St.3d 180, 182, 532 N.E.2d 735, 738. A *possible* conflict exists where the

" 'interests of the defendants *may* diverge at some point so as to place the attorney under inconsistent duties.' " (Emphasis added.) *State v. Dillon* (1995), 74 Ohio St.3d 166, 168, 657 N.E.2d 273, 275-276, quoting *Cuyler*, 446 U.S. at 356, 100 S.Ct. at 1722, 64 L.Ed.2d at 351-352, fn. 3 (concurring and dissenting opinion of Marshall, J.).

{¶ 47} In this case, there was no actual conflict. Co-defendant McNulty was not represented by Costanzo but rather by attorneys in an office in which she worked part-time. Costanzo asserted for the record that she had not discussed the case with anyone in the public defender's office and that she had not seen any papers or material concerning the case when in the public defender's office.

{¶ 48} Getsy also argues that there was "open and ongoing animosity among counsel" and lists a number of "professional and/or personal disagreements among Getsy's three attorneys that prevented them from working as a team." The record does not support this argument. The majority of instances cited are situations in which Costanzo and one of Getsy's other two attorneys were both making objections. These examples suggest agreement, not disagreement or contentiousness. The fact that two attorneys objected did not prejudice Getsy's defense. Further, the remarks cited by Getsy as indicia of a conflict did not occur in front of the jury. There were two instances in which counsel may have become sharp with each other. However, over the course of a trial that lasted more than a month, two such instances do not suggest a breakdown of Getsy's defense.

{¶ 49} Getsy has failed to show that a conflict of interest existed in the defense of his case. The second proposition of law is rejected.

*Performance*

**{¶ 50}** In order to prevail on a claim of ineffective assistance of counsel, Getsy must show that counsel's performance fell below an objective standard of reasonableness and, in addition, that he was prejudiced by counsel's performance. *Strickland v. Washington* (1984), 466 U.S. 668, 687-688, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693; *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus. The court need not address the performance component if the issue is resolved by addressing the prejudice requirement. *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069, 80 L.Ed.2d at 699.

**{¶ 51}** Our review of the record does not disclose any conduct that would violate Getsy's Sixth Amendment right to effective assistance of counsel. The merits of the specific instances mentioned by Getsy (failure to object to jury instructions, failure to object to victim-impact information, and failure to conduct an adequate voir dire) were examined in the other propositions of law. As none of them rose to the level of reversible error, counsel's performance did not fall below an objective standard of reasonableness. The third proposition of law is rejected.

*DENIAL OF MOTION TO SUPPRESS*

**{¶ 52}** An arrest warrant for Getsy was issued on July 7, 1996 as a result of the taped statement of McNulty. Getsy was arrested at around 10:00 p.m., taken to the Hubbard Township Police Station, and apprised of his *Miranda* rights. At 12:47 a.m. on July 8, 1996, he waived those rights and gave a videotaped statement to the police.

**{¶ 53}** In his sixth proposition of law, Getsy argues that his waiver was not voluntary because he was arrested at 10:00 p.m. and the taped confession did not occur until "long after midnight." Getsy faults the police officer conducting the inquiry for failing to ask Getsy whether he had slept or eaten during the day.

**{¶ 54}** In deciding whether the defendant's confession in this case was involuntarily induced, we consider the totality of the circumstances, including the

age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of the interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement. *State v. Edwards* (1976), 49 Ohio St.2d 31, 40-41, 3 O.O.3d 18, 23, 358 N.E.2d 1051, 1059.

{¶ 55} In *Colorado v. Connelly* (1986), 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473, the court held that "police overreaching" is a prerequisite to a finding of involuntariness. Evidence of use of an inherently coercive tactic (*e.g.*, physical abuse, threats, deprivation of food, medical treatment, or sleep) triggers the totality-of-the-circumstances analysis. *State v. Clark* (1988), 38 Ohio St.3d 252, 261, 527 N.E.2d 844, 854.

{¶ 56} There is no indication in the record that the police overreached in this case. Getsy never asked for food or indicated that he was tired. Although the questioning began at 12:47 a.m., this was not "long after" midnight and cannot be considered mistreatment. The videotape does not reveal any coercive actions on the part of the police officers involved in the questioning. Finally, although Getsy appeared frightened, he was not frightened of the police officers, but rather of Santine. Getsy's will was not overborne. The sixth proposition of law is rejected.

*VOIR DIRE ISSUES*

*Impartial Jury*

{¶ 57} Getsy argues in his fourth proposition of law that he was entitled to a change of venue. He describes the pretrial publicity as "emotionally charged," "vast and overwhelming," and notorious. He further contends that "the community was overwhelmed with evidence of the involvement of Jason Getsy and his co-defendants" and that there was "[e]xtensive news coverage in Trumbull County" concerning his co-defendants' pleas of guilty. Nothing in the record supports these claims.

{¶ 58} A trial court can change venue "when it appears that a fair and impartial trial cannot be held" in that court. Crim.R. 18(B); R.C. 2901.12(K).

However, " '[a] change of venue rests largely in the discretion of the trial court, and * * * appellate courts should not disturb the trial court's [venue] ruling * * * unless it is clearly shown that the trial court has abused its discretion.' " *State v. Maurer* (1984), 15 Ohio St.3d 239, 250, 15 OBR 379, 388-389, 473 N.E.2d 768, 780. " '[A] careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality.' " *State v. Landrum* (1990), 53 Ohio St.3d 107, 117, 559 N.E.2d 710, 722; *State v. Lundgren* (1995), 73 Ohio St.3d 474, 479, 653 N.E.2d 304, 313-314. The voir dire in this case uncovered some prospective jurors who were biased; those jurors were excused. The remaining potential jurors indicated that they could try the case fairly.

{¶ 59} Getsy's claim concerning pervasive publicity is also belied by the fact that he used only three of the six peremptory challenges available to him. Thus, any challenge has been waived. See *State v. Watson* (1991), 61 Ohio St.3d 1, 16, 572 N.E.2d 97, 110; *State v. Eaton* (1969), 19 Ohio St.2d 145, 149, 48 O.O.2d 188, 190, 249 N.E.2d 897, 900.

*Limited Voir Dire*

{¶ 60} Getsy argues that the trial court limited voir dire to such an extent that he was unable to obtain a fair and impartial jury. The voir dire took place between August 5 and August 16, 1996 and is recorded in 1,695 pages of transcript. Although the trial court tried to keep voir dire moving along, counsel were rarely limited in questioning potential jurors. For example, even though the court indicated that individual voir dire would be limited to the death-penalty issues, the court often let counsel address other areas that arose during individual questioning.

{¶ 61} Getsy argues that the trial court interrupted voir dire and prevented counsel from thoroughly exploring juror biases on three separate occasions. The record does not support this contention.

{¶ 62} Getsy also argues that questioning by the court during individual voir dire on the death penalty deprived him of a thorough and effective voir dire.

"The manner in which voir dire is to be conducted lies within the sound discretion of the trial judge." *State v. Lorraine* (1993), 66 Ohio St.3d 414, 418, 613 N.E.2d 212, 217. Our review of the transcripts of the voir dire does not reveal that the trial court unreasonably or arbitrarily restricted examination. In *State v. Durr* (1991), 58 Ohio St.3d 86, 89, 568 N.E.2d 674, 678, we stated that "[a]lthough R.C. 2945.27 affords the prosecution and defense the opportunity to conduct a reasonable examination of prospective jurors, * * * the trial court reserves the right and responsibility to control the proceedings of a criminal trial pursuant to R.C. 2945.03, and must limit the trial to relevant and material matters with a view toward the expeditious and effective ascertainment of truth."

*Excusal of Death-Scrupled Jurors*

**{¶ 63}** Getsy argues that the trial court improperly excused for cause four jurors who could set aside their views on the death penalty and follow the law.

**{¶ 64}** The proper standard for determining when a prospective juror may be excluded for cause based on opposition to capital punishment is whether the juror's views would prevent or substantially impair the performance of the juror's duties. *Wainwright v. Witt* (1985), 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841; *Rogers*, 17 Ohio St.3d 174, 17 OBR 414, 478 N.E.2d 984, at paragraph three of the syllabus; *State v. Beuke* (1988), 38 Ohio St.3d 29, 38, 526 N.E.2d 274, 284. The trial court's findings may not be overruled if supported by substantial testimony. *State v. Tyler* (1990), 50 Ohio St.3d 24, 30-31, 553 N.E.2d 576, 586-587.

**{¶ 65}** When questioned by the court, Juror No. 107 initially indicated that she could not impose the death penalty. Under defense counsel's questioning, the juror began to equivocate. When the court resumed questioning, she again indicated that she could not follow the law and impose the death sentence, even if appropriate.

**{¶ 66}** Juror No. 140, upon inquiry by the court, stated that he could not give the death penalty even if appropriate. During defense questioning, he

indicated that he was not morally or philosophically opposed to the death penalty. When again questioned by the court, he stated that he did not "think" he could recommend the death penalty.

{¶ 67} Juror No. 216 was not excused for cause as alleged by the defense.

{¶ 68} Juror No. 179 conclusively stated that she could not, under any circumstances, vote for the death penalty.

{¶ 69} Juror No. 185 was not opposed to the death penalty, but equivocated in his answers. He initially stated that he could not sign a death-penalty verdict, then stated he could, and then stated he could not.

{¶ 70} When the voir dires of these prospective jurors are examined under the *Witt* standard, it cannot be said that the trial court abused its discretion in excusing them for cause.

*Failure to Excuse Automatic Death-Penalty Jurors*

{¶ 71} Getsy argues that the trial court erred when it failed to remove for cause three jurors who indicated that they would automatically impose the death sentence if Getsy was convicted. To the contrary, Juror Nos. 15, 27, and 65 all indicated they could consider all available options. None of the jurors was challenged for cause by defense counsel. Juror Nos. 15 and 27 were eventually seated on Getsy's jury; the defense used one of its peremptory challenges to keep Juror No. 65 off the jury.

{¶ 72} We have previously held that error in the denial of a challenge of a juror for cause cannot be grounds for reversal when the defendant did not exhaust his peremptory challenges. *State v. Poindexter* (1988), 36 Ohio St.3d 1, 5, 520 N.E.2d 568, 572. As the defense had three peremptory challenges remaining, any error was waived.

*Improper Excusal for Cause*

{¶ 73} When the judge began his orientation instructions, he asked whether anyone in the group knew of any reason that they could not be a good juror. Juror

No. 55 raised his hand. When examined individually, Juror No. 55 indicated that he had been in this country for just six years, had trouble with big words, and had had some difficulty understanding the written orientation instructions provided by the court. The court asked whether he could excuse the juror without objection, and the prosecutor agreed, but the defense wanted an opportunity to question Juror No. 55. The trial court did not allow any questioning and excused the juror over defense objection.

{¶ 74} Crim. R. 24(B)(13) provides that a person may be challenged for cause when "English is not his native language, and his knowledge of English is insufficient to permit him to understand the facts and the law in the case." It was clear from the discussion with this juror that he was having trouble understanding the legal proceedings and in fact had to have another juror explain the written orientation instructions to him. The trial court did not commit error by excusing this juror.

*Obtaining Commitments on the Death Penalty*

{¶ 75} Getsy argues that the trial court and the prosecutor obtained commitments from prospective jurors to impose the death penalty. To the contrary, the trial court explained the weighing process to the jurors and then asked the jurors whether they could impose a death sentence and whether they could impose a life sentence. The prosecutor also asked whether the jurors could impose the death penalty if the conditions requiring it were properly proven, and if these conditions were not properly proven, whether the jurors could impose a life sentence. These questions have previously been found to be proper. *State v. Evans* (1992), 63 Ohio St.3d 231, 249-250, 586 N.E.2d 1042, 1057.

{¶ 76} Each of the arguments in this proposition of law has been rejected. The fourth proposition of law is rejected.

*Peremptory Challenges of Death-Scrupled Jurors*

**{¶ 77}** Getsy argues in his fifth proposition of law that the state improperly used its peremptory challenges to exclude jurors who were death-scrupled. This proposition of law is summarily overruled. *State v. Seiber* (1990), 56 Ohio St.3d 4, 13, 564 N.E.2d 408, 418-419.

## *INTRODUCTION OF OTHER ACTS EVIDENCE*

**{¶ 78}** Joshua Koch, a witness for the state, testified concerning conversations he had with, or overheard between, the co-defendants in this case, including Getsy. Getsy alleges in his seventh proposition of law that some of the information elicited during Koch's testimony is inadmissible "other acts" evidence.

**{¶ 79}** Getsy argues that three separate prejudicial statements were elicited: two concerning Getsy being a hitman for Santine and one indicating that Getsy, along with Hudach and McNulty, would burn down houses for Santine. Defense counsel did not object to these statements and cross-examined Koch on the latter statement. Absent an objection by counsel, this error is examined under the plain-error standard. An alleged error "does not constitute a plain error * * * unless, but for the error, the outcome of the trial clearly would have been otherwise." *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Here there is no error, plain or otherwise.

**{¶ 80}** Getsy was charged with committing the murder for hire. Accordingly, evidence concerning prior acts performed for Santine is admissible to prove motive under Evid.R. 404(B). Evid.R. 404(B) states that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

**{¶ 81}** Even if the evidence should not have been admitted, it did not affect the outcome of the case. The evidence against Getsy was substantial, including a videotaped confession. Further, it is clear from Koch's testimony that he did not

believe the statements concerning Getsy that had been made to him by Hudach. During cross-examination, Koch admitted that he did not know whether they (Getsy, Hudach, and McNulty) had done anything for Santine before, and there was no other evidence to corroborate the statements. The seventh proposition of law is rejected.

*SUFFICIENCY AND WEIGHT OF THE EVIDENCE*

**{¶ 82}** At the close of the state's case and at the close of all the evidence, the defense moved for acquittal on all counts and on the specification. The trial court denied both motions. In his tenth proposition of law, Getsy argues that the trial court erred.

**{¶ 83}** When a defendant challenges the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph two of the syllabus. A verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. *Jenks,* 61 Ohio St.3d at 273, 574 N.E.2d at 503.

**{¶ 84}** Since this case is on direct appeal from the trial court, this court has been asked to and will consider whether the convictions are against the manifest weight of the evidence. *State v. Smith* (1997), 80 Ohio St.3d 89, 102-103, 684 N.E.2d 668, 683-684. This inquiry requires an examination of the entire record and a determination of whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction. This inquiry is separate from the examination for sufficiency. The question is whether there is *substantial* evidence upon which a jury could reasonably conclude that all the

elements have been proved beyond a reasonable doubt. *State v. Eley* (1978), 56 Ohio St.2d 169, 10 O.O.3d 340, 383 N.E.2d 132, at syllabus.

{¶ 85} The facts in the record, when viewed in the light most favorable to the prosecution, support a finding of the essential elements of each crime and specification charged, beyond a reasonable doubt. Getsy's own statements are sufficient to support a finding that a conspiracy was planned and carried out by the co-defendants under Santine's supervision, that Getsy and McNulty forcefully entered the Serafino home (burglary) with the intent to kill all those inside, that Ann Serafino was killed and Chuckie Serafino shot (aggravated murder and attempted aggravated murder), and that the crimes were committed with firearms. There was evidence that the murder was done for hire, that it occurred during the course of a burglary, and that it involved the murder or attempted murder of two or more persons.

{¶ 86} After reviewing the entire record, weighing the evidence and all reasonable inferences, taking into consideration that Santine generated a certain amount of fear in Getsy, and considering the credibility of the witnesses, we conclude that the jury did not lose its way, that a manifest miscarriage of justice did not occur, and that Getsy's convictions were not against the manifest weight of the evidence. Accordingly, the tenth proposition of law is rejected.

*PROSECUTOR MISCONDUCT*

**{¶ 87}** In his twelfth proposition of law, Getsy contends that the prosecutor engaged in numerous incidents of misconduct throughout the trial.

**{¶ 88}** Getsy argues that comments made by the prosecutor in closing argument were misconduct. The prosecutor stated that the defense had no defense and when "you have no defense you attack the police, you attack the prosecutor, you attack everybody. * * * You want to look at things that aren't important to this particular case, you want to deflect, you want to look for something that doesn't exist, you want smoke so he can't be seen." Defense counsel did not object.

**{¶ 89}** We look with disfavor on remarks that denigrate defense counsel for doing their job and thereby denigrate the defendant. *State v. Keenan* (1993), 66 Ohio St.3d 402, 405-406, 613 N.E.2d 203, 206-207. The comments by the prosecutor here were error. However, unlike *Keenan,* the prosecutor's remarks in this case were not pervasive. They occurred only during closing argument and did not rise to the level of plain error. *State v. DeNicola* (1955), 163 Ohio St. 140, 56 O.O. 185, 126 N.E.2d 62, paragraph three of the syllabus.

**{¶ 90}** The remaining instances of possible misconduct cited by Getsy involve comments made by Serafino's neighbor, Fred Hanley, Jr. Getsy characterizes Hanley's comments as "victim impact evidence." Hanley was called to testify because he was awakened by the gunshots and heard someone running from the Serafino house. During the course of his testimony, the prosecutor asked Hanley what kind of relationship he had with the Serafinos, specifically Ann Serafino. In describing their relationship as that of close neighbors, he related that he had done favors for her and that she had repaid him by making him spaghetti. Hanley also opined that Ann Serafino was a "super woman." It does not appear that the state solicited this remark. There was no objection. This isolated comment did not rise to the level of plain error. *Long*, 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.

**{¶ 91}** During closing argument in the trial phase, the prosecutor made the following argument:

"It is fundamental that the law be upheld, that we recognize the constitutional rights of the accused, Jason Getsy, that the State, if it can, prove his guilt beyond a reasonable doubt.

"*On the other side of the coin it's just as important to all of us that Ann Serafino have a right, did have a right to live and enjoy life in our community.* No one has a right to extinguish the lives of others, no one has a right to burglarize one's home, no one has a right to attempt to kill other persons." (Emphasis added.)

**{¶ 92}** Getsy argues that the emphasized portion amounted to an attempt by the prosecutor to create sympathy for the victim by referring to unacceptable victim-impact statements. We disagree. Given the context of the prosecutor's remarks, these statements do not constitute victim-impact evidence. The prosecutor was merely pointing out that persons have a right to live and that the act of murder takes away that right. "Evidence relating to the facts attendant to the offense, however, is clearly admissible during the guilt phase." *State v. Fautenberry* (1995), 72 Ohio St.3d 435, 440, 650 N.E.2d 878, 883. Since there was no error, defense counsel's failure to object is irrelevant to the claim of ineffective assistance of counsel.

**{¶ 93}** Because none of Getsy's allegations concerning prosecutorial misconduct rises to the level of plain error, the twelfth proposition of law is rejected.

### *JURY INSTRUCTION*

**{¶ 94}** In his eighth, ninth, and eleventh propositions of law, Getsy challenges the jury instructions given in the trial and penalty phases.

### *Trial Phase*

**{¶ 95}** Getsy argues that the trial court erroneously instructed the jury on causation. The trial court instructed:

"The defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act or failure to act. The defendant is also responsible for the natural and foreseeable consequences or results that follow in the ordinary course of events from the act or the failure to act."

{¶ 96} No objection was made to this instruction; therefore, the error is reviewed under the plain error standard. *Long,* 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus. Getsy argues that this instruction permitted the jury to convict him for aggravated murder based on a finding of less than specific intent to cause the death of another in violation of R.C. 2903.01(D). See *State v. Jacks* (1989), 63 Ohio App.3d 200, 578 N.E.2d 512; *State v. Burchfield* (1993), 66 Ohio St.3d 261, 262, 611 N.E.2d 819, 820.

{¶ 97} In *State v. Frazier* (1995), 73 Ohio St.3d 323, 331, 652 N.E.2d 1000, 1008, we addressed an instruction of this type and found no harm because the jury was required to find that the defendant acted with specific intent. A "jury instruction '* * * must be viewed in the context of the overall charge, * * *' rather than in isolation." *State v. Thompson* (1987), 33 Ohio St.3d 1, 12-13, 514 N.E.2d 407, 419; *State v. Price* (1979), 60 Ohio St.2d 136, 14 O.O.3d 379, 398 N.E.2d 772, paragraph four of the syllabus.

{¶ 98} In *Burchfield,* we stated: "The usefulness in murder cases of the foreseeability instruction is questionable, especially given its potential to mislead jurors." *Burchfield,* 66 Ohio St.3d at 263, 611 N.E.2d at 821. We reiterate this caution today. In Getsy's case, reversal is not required because, to the extent the instructions amounted to error, they did not rise to the level of plain error. Other instructions in the case limited the prejudicial effect. When viewed in their entirety, the jury instructions given by the trial court in this case did not prejudice appellant.

{¶ 99} Getsy next argues that the trial court used a mandatory presumption in violation of the constitution when it instructed the jury:

23

"If a wound is inflicted upon a person with a deadly weapon in a manner calculated to destroy life the purpose to kill may be inferred from the use of the weapon."

{¶ 100} Getsy failed to object to this instruction at trial and waived all but plain error. *State v. Underwood* (1983), 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332. Moreover, the court used the word "may," indicating that the presumption was permissive—one the jury could accept, not one the jury was required to accept. *State v. Loza* (1994), 71 Ohio St.3d 61, 81, 641 N.E.2d 1082, 1104; *Edwards*, 49 Ohio St.2d at 45, 3 O.O.3d at 26, 358 N.E.2d at 1061. We conclude that there was no error, plain or otherwise.

{¶ 101} Getsy next challenges the instruction defining "principal offender." The trial court instructed that a principal offender is "one who personally performs every act constituting the offense which relative to this specification is aggravated murder." While there was no objection to this instruction, Getsy now argues that the trial court should have instructed the jury that the principal offender is the "actual killer."

{¶ 102} The Revised Code and Ohio Jury Instructions do not define "principal offender." We have previously held that the term "principal offender" in R.C. 2929.04(A)(7) means the "actual killer." *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746; *State v. Wiles* (1991), 59 Ohio St.3d 71, 92, 571 N.E.2d 97, 122; *State v. Taylor* (1993), 66 Ohio St.3d 295, 308, 612 N.E.2d 316, 325.

{¶ 103} In *State v. Sneed* (1992), 63 Ohio St.3d 3, 11-12, 584 N.E.2d 1160, 1168, jurors signed a verdict form that stated that Sneed had "personally performed every act constituting the offense of aggravated murder." This court concluded that such a statement was tantamount to a specific finding that Sneed was the principal offender and held that R.C. 2929.04(A)(7) had been complied with.

24

**{¶ 104}** Getsy argues that the instructions given were improper. We disagree. Both definitions of "principal offender" convey the same meaning with respect to the culpability required by the capital specification. We recently stated, "* * * we have never held that [principal offender] means 'the sole offender.' There can be more than one actual killer—and thus more than one principal offender—in an aggravated murder." *State v. Keene* (1998), 81 Ohio St.3d 646, 655, 693 N.E.2d 246, 256. The instruction given by the trial court was not plain error.

**{¶ 105}** Getsy's eighth proposition of law, concerning errors in the trial phase jury instructions, is rejected.

*Failure to Instruct on Duress*

**{¶ 106}** Prior to the trial phase, the state filed a motion *in limine* to prohibit Getsy from presenting any evidence or argument on the defense of duress. The court determined that duress could be used as a defense to the underlying felony and to felony murder, and asked the defense whether they intended to present evidence to prove the defense. The defense indicated that it so intended, and the trial went forward.

**{¶ 107}** The defense later requested an instruction on the affirmative defense of duress, which the trial court denied upon finding insufficient evidence to prove the defense. The trial court did instruct on the mitigating factor of duress in the penalty phase. R.C. 2929.04(B)(2). Getsy now argues that the trial court erred in denying his request for an instruction on duress in the trial phase.

**{¶ 108}** The defense of duress has long been recognized as a legitimate defense to all crimes. *State v. Sappienza* (1911), 84 Ohio St. 63, 95 N.E. 381. At common law, the exception to that principle is the taking of the life of an innocent person. See Annotation (1955), 40 A.L.R.2d 908. This court has never squarely addressed the issue of whether duress is a defense to aggravated murder.

**{¶ 109}** We have held that duress can be used as a defense to certain felonies. Therefore, if duress is a valid defense to the underlying felony in a felony-

murder trial, a defendant can be convicted of murder, but not of aggravated murder. *State v. Woods* (1976), 48 Ohio St.2d 127, 135, 2 O.O.3d 289, 293, 357 N.E.2d 1059, 1065. This situation would necessitate giving a lesser-included-offense instruction on murder in a felony-murder trial. In this case, the state elected to take the prior-calculation-and-design count into the penalty phase; therefore, any argument concerning the felony-murder count is moot. The question remains whether a duress instruction should apply to the remaining count of aggravated murder based on prior calculation and design.

{¶ 110} In *Woods*, 48 Ohio St.2d at 135, 2 O.O.3d at 293, 357 N.E.2d at 1065, fn. 3, this court stated:

"There is strong precedent for holding that duress is not a defense to murder, but that question has not been decided in Ohio. At common law, no person can excuse himself for taking the life of an innocent person on the grounds of duress. *Arp v. State* (1893), 97 Ala. 5, 12 So. 301; *Watson v. State* (1951), 212 Miss. 788, 55 So.2d 441; *State v. Weston* (1923), 109 Or. 19, 219 P. 180; *State v. Nargashian* (1904), 26 R.I. 299, 58 A. 953; *Leach v. State* (1897), 99 Tenn. 584, 42 S.W. 195. This rule has been modified by statute in some states. *Jones v. State* (1950), 207 Ga. 379, 62 S.E.2d 187; *Paris v. State* (1895), 35 Tex.Cr. 82, 31 S.W. 855."

{¶ 111} It can be inferred from the inclusion of duress as a mitigating factor in R.C. 2929.04(B) that the General Assembly did not intend duress to be an affirmative defense to aggravated murder. There is no legal authority for applying the affirmative defense of duress in a trial for aggravated murder committed with prior calculation and design. We hold that duress cannot be asserted as a defense to aggravated murder under R.C. 2903.01(A).

{¶ 112} The question left is whether the trial court abused its discretion in failing to instruct on duress as an affirmative defense to the capital specifications or to aggravated burglary. Getsy had the burden of going forward with evidence of a nature and quality sufficient to raise the defense. R.C. 2901.05; *State v. Melchior*

(1978), 56 Ohio St.2d 15, 20, 10 O.O.3d 8, 11, 381 N.E.2d 195, 199. In construing the phrase "burden of going forward with the evidence," we stated in *State v. Robinson* (1976), 47 Ohio St.2d 103, 111-112, 1 O.O.3d 61, 66, 351 N.E.2d 88, 94, that in order for the defendant to successfully raise an affirmative defense, "evidence of a nature and quality sufficient to raise the issue must be introduced." Evidence is sufficient where a reasonable doubt of guilt has arisen based upon a claim of duress. If the evidence generates only a mere speculation or possible doubt, such evidence is insufficient to raise the affirmative defense, and submission of the issue to the jury will be unwarranted. *Melchior* at 20, 10 O.O.3d at 11-12, 381 N.E.2d at 199.

{¶ 113} One of the essential features of the defense of duress is a sense of immediate, imminent death, or serious bodily injury if the actor does not commit the act as instructed. See *State v. Cross* (1979), 58 Ohio St.2d 482, 487, 12 O.O.3d 396, 399, 391 N.E.2d 319, 323. The force used to compel the actor's conduct must remain constant, controlling the will of the unwilling actor during the entire time he commits the act, and must be of such a nature that the actor cannot safely withdraw. See *State v. Good* (1960), 110 Ohio App. 415, 11 O.O.2d 459, 165 N.E.2d 28. Applying this standard, it is apparent that Getsy failed to show that his criminal conduct occurred as a result of a continuous threat from Santine, which, because of his fear of bodily harm or death, controlled his will and compelled him to break into the Serafino home and shoot Ann and Chuckie Serafino.

{¶ 114} While evidence was presented to suggest that Santine was known to make threats, such as the threats he made concerning Chuckie Serafino, there was no evidence that Santine ever directly threatened Getsy. Getsy argues that Santine stated that he had the police in his pocket and that he had mob connections and therefore that Getsy did not feel he could go to the police. Getsy also knew that Santine shot his own brother and that Santine carried a gun. This evidence did not rise to the level of "a sense of imminent, immediate and impending death or

serious bodily injury." *Cross*, 58 Ohio St.2d 482, 487, 12 O.O.3d 396, 399, 391 N.E.2d 319, 323.

{¶ 115} While Getsy exhibited fear during his videotaped confession and there were indications that Getsy (as well as the co-defendants) feared Santine, some of his actions belie his claim that he acted under duress or coercion. *Woods* requires an examination of the individual involved, not the ordinary man. Getsy observed Mike Dripps refuse involvement in the scheme and suffer no consequences. Further, Ben Hudach feigned an ankle injury to avoid further involvement in the crime. Getsy, Hudach, and McNulty could have banded together and refused to carry out Santine's orders. Getsy was not employed by Santine, so there was no threat of loss of employment. In addition, Getsy took his own weapon to the crime scene.

{¶ 116} Arguably, the defense of duress could have been asserted for the aggravating circumstance of murder for hire, but the evidence presented by the state, if believed, indicated that Getsy was the only one of the three who wanted the money.

{¶ 117} Getsy did not satisfy his burden of presenting evidence of a nature and quality sufficient to raise the defense of duress and merit an instruction. Therefore, the trial court did not err in failing to instruct on the affirmative defense of duress. Getsy's ninth proposition of law is rejected.

*Sentencing Phase*

**{¶ 118}** Getsy presents six reasons why the jury instructions in the penalty phase were erroneous. He first argues that the trial court erred by failing to give the jury instructions at the start of the penalty phase concerning the nature of the proceedings. Defense counsel did not request such an instruction. Therefore, all but plain error is waived. *Underwood*, 3 Ohio St.3d 12, 3 OBR 360, 444 N.E.2d 1332.

**{¶ 119}** The jurors were given written instructions prior to voir dire that explained the procedures. On individual voir dire, the trial court explained that there might be two phases and explained the procedure that would be followed in the penalty phase. Further, the idea of mitigation was discussed during voir dire. The jurors were not unaware of penalty-phase procedures. In addition, the trial court correctly instructed the jury at the conclusion of the penalty phase concerning the jury's task in deliberations. The failure to give preliminary instructions was not plain error.

**{¶ 120}** Getsy next argues that the trial court did not properly define the terms "mitigating factor" and "mitigation" for the jury, and therefore that the jury had no guidance as to what a mitigating factor was, or what the purpose of mitigation was. We disagree.

**{¶ 121}** Prior to the trial, Getsy filed a motion to alter the definition of "mitigating factors." The trial court denied this motion. Subsequently, the trial court instructed:

"Mitigating factors are factors that, while they do not justify or excuse the crimes of aggravated murder, nevertheless may be considered by you as extenuating, lessening, weakening, excusing to some extent or reducing the degree of sentence."

**{¶ 122}** In *State v. Holloway* (1988), 38 Ohio St.3d 239, 527 N.E.2d 831, the court explained that "mitigating factors under R.C. 2929.04(B) are not related

to a defendant's culpability but, rather, are those factors that are relevant to the issue of whether an offender convicted under R.C. 2903.01 should be sentenced to death." *Id*. at 242, 527 N.E.2d at 835. See, also, *State v. Lawrence* (1989), 44 Ohio St.3d 24, 28-29, 541 N.E.2d 451, 457. Further, the court has frequently stated that a mitigating factor " 'lessens the moral culpability of the offender or diminishes the appropriateness of death as the penalty.' " *State v. DePew* (1988), 38 Ohio St.3d 275, 292, 528 N.E.2d 542, 560, quoting *State v. Steffen* (1987), 31 Ohio St.3d 111, 129, 31 OBR 273, 289, 509 N.E.2d 383, 399.

{¶ 123} The inclusion of the words "lessening, weakening, excusing," which are typically associated with blame or culpability for the crime, resulted in an instruction that strayed from the definition approved in *Holloway.* However, when reviewed in their entirety, the instructions adequately guided the jury and did not restrict its consideration of mitigating evidence. See *State v. Wilson* (1996), 74 Ohio St.3d 381, 397, 659 N.E.2d 292, 308; *State v. Murphy*, 65 Ohio St.3d at 577, 605 N.E.2d at 903; *State v. Landrum*, 53 Ohio St.3d at 123, 559 N.E.2d at 728.

{¶ 124} Getsy also argues that the trial court erred in admitting all the evidence from the trial phase into the penalty phase and instructing the jury to consider "all the evidence, including exhibits presented in the first phase of this trial *which you deem to be relevant*." (Emphasis added.) Getsy argues that it was the trial court's responsibility, not the jury's, to determine what evidence was relevant. We agree.

{¶ 125} It is the trial court's responsibility to determine the admissibility of evidence. Evid.R. 104(A); *State v. Heinish* (1990), 50 Ohio St.3d 231, 553 N.E.2d 1026.

{¶ 126} The trial court denied the defense request to exclude certain items (*i.e.*, shotgun, ballistic reports, and blood) from the penalty-phase deliberations. The defense renewed the request after the jury instructions were given and specifically objected to the instruction regarding the exhibits.

{¶ 127} In *State v. Gumm* (1995), 73 Ohio St.3d 413, 653 N.E.2d 253, syllabus, we held: "Subject to applicable Rules of Evidence, and pursuant to R.C. 2929.03(D)(1) and (2), counsel for the state at the penalty stage of a capital trial may introduce and comment upon (1) any evidence raised at trial that is relevant to the aggravating circumstances specified in the indictment of which the defendant was found guilty, (2) any other testimony or evidence relevant to the nature and circumstances of the aggravating circumstances specified on the indictment of which the defendant was found guilty, (3) evidence rebutting the existence of any statutorily defined or other mitigating factors first asserted by the defendant * * *." This holding appears to require the trial court to determine what evidence is relevant.

{¶ 128} Trial counsel articulated some items that they deemed irrelevant. After an examination of the items mentioned by trial counsel, it is clear that some, such as the blood samples, were not relevant. However, the admission of irrelevant evidence into the penalty phase did not prejudice the outcome in this case.

{¶ 129} Getsy also claims that the trial court should have instructed on mercy. We have previously held that such an instruction is not required. *State v. Allen* (1995), 73 Ohio St.3d 626, 638, 653 N.E.2d 675, 687; *Lorraine*, 66 Ohio St.3d at 417, 613 N.E.2d at 216.

{¶ 130} Getsy also argues that the use of the word "recommendation" in the jury instructions was error. The defense filed a motion to prohibit the trial court from referring to the jury's penalty phase verdict as a recommendation. The trial court denied the motion.

{¶ 131} Use of an instruction that the jury verdict is a "recommendation" accurately reflects Ohio law and does not diminish the jury's overall sense of responsibility. *State v. Henderson* (1988), 39 Ohio St.3d 24, 29-30, 528 N.E.2d 1237, 1243; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75, 80-81. We have stated that although error is not committed by the mere use of the word

"recommendation," we prefer that courts trying capital cases include in jury instructions a statement similar to that commended in *State v. Mills* (1992), 62 Ohio St.3d 357, 375, 582 N.E.2d 972, 988. In *Mills*, this court said, "Simply put, you [the jury] should recommend the appropriate sentence as though your recommendation will, in fact, be carried out." See *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 651 N.E.2d 965, 978. The trial court did not include this latter instruction.

{¶ 132} The use of the word "recommendation" was not overemphasized in the penalty instructions, nor was it amplified by use of the word "mere" or any other word tending to downplay the significance of the jury's recommendation. While the preferable alternative would have been to include the language approved in *Mills* and *Carter*, the instruction given does not constitute prejudicial error.

{¶ 133} Getsy also argues that the jury instructions in the penalty phase relieved the state of its burden of proving, beyond a reasonable doubt, that the aggravating circumstances outweighed the mitigating factors. No objection was made at trial; therefore, this instruction will be reviewed under the plain-error standard. See *Underwood* at syllabus. The jury instruction clearly placed the burden on the state to prove that the aggravating circumstances outweighed the mitigating factors, beyond a reasonable doubt.

{¶ 134} Getsy also contends that the "beyond a reasonable doubt" standard instruction given in the trial phase was error and that the standard of proof should be beyond all doubt for both phases. The trial court's reasonable doubt instruction for the trial phase was in accord with R.C. 2901.05(D), which we have held constitutional. See *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 594 N.E.2d 604. Further, the definition used in the penalty phase of the case comports with this court's suggested instruction. *State v. Taylor* (1997), 78 Ohio St.3d 15, 29, 676 N.E.2d 82, 96. See, also, *State v. Mitts* (1998), 81 Ohio St.3d 223, 233, 690 N.E.2d 522, 531. Finally, this court has rejected the "beyond all doubt" standard of proof

suggested by the defense. *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph eight of the syllabus.

{¶ 135} We find no reversible error in the jury instructions in the penalty phase and reject the eleventh proposition of law.

*SELECTIVE PROSECUTION*

{¶ 136} Four co-defendants were involved in the murder of Ann Serafino and the attempted murder of Chuckie Serafino: John Santine, Richard McNulty, Ben Hudach, and Jason Getsy. Getsy filed a motion in the trial court to dismiss the capital specifications due to selective enforcement of the capital statutes. In his fourteenth proposition of law, Getsy challenges the denial of his motion.

{¶ 137} The record indicates that Hudach was allowed to plead guilty to an amended indictment in which the death-penalty specifications were dismissed. In exchange, he agreed to cooperate fully with the state, to take a polygraph examination, if requested, and to testify against Santine.

{¶ 138} McNulty also entered into a plea arrangement with the state. McNulty pled guilty to aggravated murder with specifications, attempted aggravated murder, and aggravated burglary. He agreed to testify against any of the co-defendants, to take a polygraph examination, if requested, and to waive all appeals. In exchange, the state would recommend life imprisonment with parole eligibility after thirty years on the aggravated murder count, with a maximum of thirty-six years total on all charges.

{¶ 139} Santine's trial went forward after Getsy's. At the time of Getsy's trial, Santine faced charges similar to those for which Getsy was tried. Getsy was never offered a plea agreement.

{¶ 140} In *State v. Flynt* (1980), 63 Ohio St.2d 132, 134, 17 O.O.3d 81, 82, 407 N.E.2d 15, 17, we adopted the following test with regard to selective-prosecution claims:

" 'To support a defense of selective or discriminatory prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.' " (Quoting *United States v. Berrios* [C.A.2, 1974], 501 F.2d 1207, 1211.) See, also, *State v. Lawson* (1992), 64 Ohio St.3d 336, 346, 595 N.E.2d 902, 910.

**{¶ 141}** A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution. *United States v. Armstrong* (1996), 517 U.S. 456, 463, 116 S.Ct. 1480, 1486, 134 L.Ed.2d 687, 698. As the court stated in *Armstrong*, "the standard is a demanding one." *Id.*

**{¶ 142}** The trial court found that Getsy failed to establish either prong of the *Flynt* test. We agree. It appears from the record that the co-defendants in this case were similarly charged. At the time Getsy's case went to trial, the case against Santine, which included capital specifications, was pending. Getsy was not singled out for prosecution, since all of the co-defendants were prosecuted. He therefore fails to meet the first prong of the *Flynt* test. Further, nothing in the record suggests that the offer of a plea bargain to Hudach and McNulty or the lack of an offer to Getsy was based upon impermissible considerations, such as race, religion, or the desire to prevent Getsy's exercise of constitutional rights, as required by the second prong of the *Flynt* test.

**{¶ 143}** The trial court did not abuse its discretion in denying Getsy's motion, and, therefore, the fourteenth proposition of law is rejected.

*PROPORTIONALITY REVIEW*

34

{¶ 144} Getsy argues, in his sixteenth proposition of law, that the death-penalty review procedures are flawed because the court limits itself to death cases when conducting its statutorily mandated proportionality review. This argument is summarily rejected. *Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

### GENERAL CONSTITUTIONAL CHALLENGE

{¶ 145} In his sixteenth proposition of law, Getsy further argues that Ohio's capital sentencing scheme violates the Eighth and Fourteenth Amendments to the United States Constitution and similar provisions. We summarily reject these claims. See *Jenkins*, 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264; *State v. Sowell* (1988), 39 Ohio St.3d 322, 336, 530 N.E.2d 1294, 1309; *Steffen*, 31 Ohio St.3d at 125, 31 OBR at 285-286, 509 N.E.2d at 396; *State v. Grant* (1993), 67 Ohio St.3d 465, 483, 620 N.E.2d 50, 69; *Maurer*, 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph six of the syllabus; *State v. Lewis* (1993), 67 Ohio St.3d 200, 206, 616 N.E.2d 921, 926; *State v. Buell* (1986), 22 Ohio St.3d 124, 22 OBR 203, 489 N.E.2d 795; *State v. Phillips* (1995), 74 Ohio St.3d 72, 656 N.E.2d 643.

### CONSTITUTIONALITY OF NEW DIRECT APPEAL PROCEDURES

{¶ 146} Getsy, in his sixteenth proposition of law, also challenges the constitutional change which removed the courts of appeals from the direct review process and limits direct review to review by this court. This argument is summarily rejected. *Smith*, 80 Ohio St.3d 89, 684 N.E.2d 668.

### INDEPENDENT SENTENCE REVIEW

{¶ 147} Having rejected Getsy's propositions of law set forth above, and having affirmed his conviction for aggravated murder, we now must independently determine whether the evidence supports the aggravating circumstances, whether the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt, and whether the death sentence is proportionate to those affirmed in similar cases.

*Appropriateness and Proportionality*

**{¶ 148}** Getsy argues, in his remaining propositions of law, that his death sentence is not appropriate and is disproportionate, and that the aggravating circumstances do not outweigh the mitigating factors beyond a reasonable doubt. These arguments will be taken into account during our independent sentence review.

**{¶ 149}** The state elected to go forward with Count One, that Getsy purposefully and with prior calculation and design caused the death of Ann Serafino. The evidence in the record supports a finding that Getsy committed the aggravated murder of Ann Serafino for hire, that the murder of Ann Serafino was part of a course of conduct involving the purposeful killing of or attempt to kill two or more persons, and that the aggravated murder was committed during an aggravated burglary. Moreover, the evidence establishes that Getsy was the principal offender (actual killer) in the commission of the aggravated murder.

**{¶ 150}** During the penalty phase, Getsy presented evidence on two statutory mitigating factors as well as evidence relating to his history, character, and background. Getsy presented evidence concerning his fear of Santine. A jury can take into account "[w]hether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation." R.C. 2929.04(B)(2). This court has previously held that "duress" and "coercion" are to be construed more broadly when considered as mitigating factors than when considered as an affirmative defense. See *Woods*, 48 Ohio St.2d at 135, 2 O.O.3d at 293, 357 N.E.2d at 1065. "These constructions appropriately allow consideration of the broad range of information relevant to mitigation set out in R.C. 2929.04." *State v. Osborne* (1976), 49 Ohio St.2d 135, 147, 3 O.O.3d 79, 85, 359 N.E.2d 78, 86. Therefore, even when, as here, duress is not an affirmative defense to aggravated murder under R.C. 2903.01(A), it is entitled to some weight as a mitigating factor.

{¶ 151} Getsy, unlike Hudach and McNulty, did not work for Santine or know Ann and Chuckie Serafino. It is clear that Getsy would not have committed these crimes if he had never met Santine. At the same time, it is evident that Hudach and McNulty would not have participated in the crime but for the encouragement and participation of Santine.

{¶ 152} Santine was approximately thirty-five years old. Getsy was nineteen when the crimes were committed. Santine paid the rent for the apartment where Hudach and McNulty lived and supplied some of the drugs that they and their friends used. Santine bragged that he had connections with the mob and often spoke of his Mafia connections. When anyone in the group needed money, they asked Santine for it.

{¶ 153} Santine bragged that he had the police in his pocket and had "fixed" a ticket for Hudach. Santine was known to have shot his own brother and apparently had never served time for the incident. Santine was known to routinely carry a duffel bag containing a gun. One time, Hudach and Robert Stoneburner were sitting with Santine when Santine shot a wall for no apparent reason. Santine commented that he wished it had been Chuckie (Serafino).

{¶ 154} Getsy was aware of these incidents and they caused him to be scared of Santine. Getsy had a close friendship with Hudach and considered himself Hudach's protector. He was apparently fearful of Hudach's connection with Santine.

{¶ 155} It was clear from the videotape of his statement that Getsy feared Santine and was afraid that Santine would execute him. Getsy apparently was afraid to go to the police because Santine made it appear that he had the police in his pocket. This belief was supported by the fact that McNulty told police what Santine was planning and the police did nothing.

{¶ 156} This court has held that "in determining whether a course of conduct results in duress, the question is not what effect such conduct would have

upon an ordinary man but rather the effect upon the particular person toward whom such conduct is directed, and in determining such effect the age, sex, health and mental condition of the person affected, the relationship of the parties and all the surrounding circumstances may be considered." *Tallmadge v. Robinson* (1952), 158 Ohio St. 333, 49 O.O. 206, 109 N.E.2d 496, paragraph two of the syllabus. Accordingly, we will examine the impact of coercion or duress as it affected Getsy, not as it should have affected a reasonable person.

{¶ 157} While what Getsy felt or believed about Santine did not rise to the level of a duress defense, it was clear that it played a part in his behavior on the night of the crime. When the group first went to the Serafino house, they returned to the apartment without completing the act, using the excuse that they could not find a place to park. Santine became furious, eventually driving Getsy, McNulty, and Hudach back to the place himself. Santine did not remain at the Serafino house with the others. Even so, Getsy testified that he had no choice but to carry out the plan.

{¶ 158} Dr. James Eisenberg testified that Getsy's psychological profile confirmed the fact that Getsy felt trapped by Santine. McNulty's attempts to contact the police with no response reinforced Getsy's helplessness. According to Dr. Eisenberg, Getsy was under considerable duress or coercion at the time of the killing. Getsy did not feel he could leave, since he felt Santine would take it out on his family. In addition, Dr. Eisenberg stated, Santine had told Getsy and the others that once they were in, there was no way out. Even shooting Santine was not a solution, since Santine had indicated how well he was connected with the mob and that they would come after Getsy and his family.

{¶ 159} This court has not found the existence of "duress, coercion, or strong provocation" on many occasions. The court has at times given some weight to the provocation aspect of R.C. 2929.04(B)(2). *Lawrence*, 44 Ohio St.3d at 32, 541 N.E.2d at 459-460; *Taylor*, 78 Ohio St.3d at 33, 676 N.E.2d at 98. In examining

the specific factor of duress or coercion, this court gave no weight to the factor in *State v. D'Ambrosio* (1995), 73 Ohio St.3d 141, 145, 652 N.E.2d 710, 714, finding that the defendant committed the crime of his own free will. In *Seiber*, 56 Ohio St.3d at 8, 564 N.E.2d at 415, the court gave the factor no weight, finding, "No outside force or person pressured appellant to act as he did." In this case, the record supports a finding that Getsy was influenced by Santine. However, Getsy was not compelled or forced to act as he did. See *Woods*, 48 Ohio St.2d at 136-137, 2 O.O.3d at 294, 357 N.E.2d at 1065-1066. It is clear from the record that Santine did not threaten Getsy and that Santine was not present during the actual shootings. No weight will be given to duress as a mitigating factor.

{¶ 160} Getsy was nineteen years old at the time this crime was committed. Therefore, youth of the offender (R.C. 2929.04[B][4] ) is entitled to some weight as a mitigating factor.

{¶ 161} Getsy's history and background provide few mitigating features. Getsy's parents married when his mother became pregnant, but his father abandoned the family shortly after Getsy's birth. His mother was subsequently involved in a number of violent relationships, once being beaten so badly she nearly lost an eye. Getsy was often present during these beatings, and on at least one occasion was subjected to a beating. Getsy's maternal grandfather testified that Getsy's mother was not a good parent. Getsy's grandparents considered seeking custody, but never followed through.

{¶ 162} When Getsy was ten, his mother married Bill Getsy, who later adopted Getsy. Bill Getsy shared his interest in firearms with Getsy, taking him to a quarry where they would shoot guns. This experience gave Getsy a sense of the power of weapons and, according to Dr. Eisenberg, helped him bond with his stepfather.

{¶ 163} Getsy was employed at the time the crimes were committed. His employment is entitled to some weight. *State v. Simko* (1994), 71 Ohio St.3d 483, 644 N.E.2d 345.

{¶ 164} Several witnesses testified on Getsy's behalf during the penalty phase. His employer testified that Getsy was a good worker. His former girlfriend, Ann Porter, and her father testified that Getsy was a nice kid. Getsy's wrestling coach described him as quiet and respectable and stated that Getsy would be welcomed in his family. The coach testified that Getsy had quit the wrestling team to work and help the family. McNulty's aunts and Hudach's father also testified during the penalty phase.

{¶ 165} Getsy's pastor testified that he had known Getsy's family for twenty-five years and had counseled the family. He also indicated that he had visited Getsy every week for the past fourteen months and that Getsy was sorrowful for the murder and very remorseful. The pastor indicated that Getsy now realized that it would have been better to give his own life than to have followed through with Santine's plan. Getsy's remorse is entitled to little weight. *State v. Rojas* (1992), 64 Ohio St.3d 131, 592 N.E.2d 1376.

{¶ 166} According to Dr. Eisenberg, Dripps, McNulty, Hudach, and Getsy were bonded together and "saw each other as kind of the odd man out in their relationships and clung to each other for various reasons." Dr. Eisenberg stated that while Santine had made threats to all four of the boys, Getsy was the most afraid of him. Getsy's role in life seemed to be one of protector. He had watched people get abused, like his mother, and stepped in, psychologically, if in no other way, to protect them. He felt particularly protective towards Hudach, since Santine had once fired a gun over Hudach's head. Dr. Eisenberg also testified that Getsy had seen a lot of violence in his life and had seen threats, that others might discount, actually carried out. For example, his house had been shot at by drug dealers when he was growing up. Dr. Eisenberg also indicated that there was some "group

dynamic effect" among Hudach, McNulty, and Getsy. Dr. Eisenberg believed that none of them individually would have carried out the crime, but only all three together.

{¶ 167} Hudach's attorney testified that his client had been charged with the same crimes as Getsy, but had been allowed to plead guilty in a plea bargain that allowed him to be eligible for parole in thirteen and a half years. McNulty's attorney testified that his client had been charged with the same crimes as Getsy but had been allowed to plead guilty in a plea bargain that allowed him to be eligible for parole in thirty-six and a half years.

{¶ 168} Santine was tried after Getsy. A copy of Santine's sentencing entry, which is in the record, indicates that he was found guilty of aggravated murder, attempted aggravated murder, conspiracy to commit aggravated murder, and aggravated burglary. He was not convicted of the capital specifications and therefore could not be sentenced to death.

{¶ 169} In *Parker v. Dugger* (1991), 498 U.S. 308, 111 S.Ct. 731, 112 L.Ed.2d 812, the United States Supreme Court implicitly recognized that a co-defendant's sentence could be considered a nonstatutory mitigating factor. That Hudach received a lesser penalty than Getsy is not surprising — Hudach did not enter the Serafino home. McNulty did, and he shot one of the victims; nevertheless, he was offered a plea bargain, Getsy was not. Furthermore, McNulty did not testify against Getsy; therefore, McNulty's case was not a case of the state's needing to secure testimony to obtain a conviction on a more culpable person.

{¶ 170} It is also troubling that Santine did not receive the death sentence even though he initiated the crime. If not for John Santine, it is unlikely the Serafinos would have been shot. In sum, we give some weight to the fact that none of the co-defendants was sentenced to death.

{¶ 171} Getsy, once arrested, was cooperative with the police. He indicated his involvement and expressed remorse during the course of his unsworn statement.

Both cooperation with authorities and remorse have been recognized as mitigating factors, but we accord them little weight. *Rojas*, 64 Ohio St.3d at 143, 592 N.E.2d at 1387.

**{¶ 172}** In determining whether the sentence of death is appropriate, this court must consider whether the sentence is disproportionate to the penalty imposed in similar cases. No previous case has the same three aggravating circumstances. The predominant specification in this case is the murder-for-hire specification. Only two reported cases have presented that specification: *State v. Davis* (1991), 62 Ohio St.3d 326, 581 N.E.2d 1362, and *State v. Williams* (1988), 38 Ohio St.3d 346, 528 N.E.2d 910.

**{¶ 173}** In *Williams*, the defendant hired a man to kill the victim, after failing to kill the victim himself. He paid off the contract with drugs and money. His mitigating evidence consisted of the fact that he had a wife and child.

**{¶ 174}** In *Davis*, the defendant was hired by another to kill the victim, Piazza. The situation was somewhat similar to the case at bar in that an innocent person (whose death was unrelated to the reason for the killing) was killed in the course of the murder for hire. Piazza, the person who put out the contract, and Davis were all involved in illegal activities involving stolen auto parts and trafficking in controlled substances. Davis presented mitigating evidence that he was a good father, was honorably discharged from the army, and was a good prisoner.

**{¶ 175}** In reviewing the facts of these cases, it is clear that imposing the death sentence on Getsy is not disproportionate. Although Getsy presented more mitigating evidence, none of it is entitled to significant weight. The factors entitled to some weight are his age, his remorse, his cooperation during the police investigation, his employment status, his family background, and the sentences received by his co-defendants. None of these factors is entitled to significant weight in mitigation.

{¶ 176} In weighing the aggravating circumstances against the mitigating factors, we conclude that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

{¶ 177} The judgment of the court of common pleas, including Getsy's convictions and sentence of death, is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, COOK and LUNDBERG STRATTON, JJ., concur.

LUNDBERG STRATTON, J., concurs separately.

_____

**LUNDBERG STRATTON, J., concurring.**

{¶ 178} Although the majority holds that the trial court did not err in failing to instruct on the affirmative defense of duress and ultimately affirms the convictions and sentence of death, I write separately to illustrate the complete lack of evidence of duress.

{¶ 179} One of the essential features of a necessity or duress defense is the "sense of present, imminent, immediate and impending death, or serious bodily injury." *State v. Cross* (1979), 58 Ohio St.2d 482, 487, 12 O.O.3d 396, 399, 391 N.E.2d 319, 323. The majority concedes that there was no evidence that Santine ever directly threatened defendant. However, the absence of evidence of duress is much deeper than that.

{¶ 180} There are several facts indicating an absence of duress. First, defendant did not work for Santine. Instead, he worked for a local hardware store. Therefore, defendant did not depend on Santine for his legitimate livelihood. Second, defendant had opportunities to abort the murder plot. In the car with Santine, McNulty, and Hudach on the way to the crime scene, defendant was armed with an assault weapon and a .357 Magnum revolver while Santine was unarmed. Defendant had time to walk away from the crimes as he waited in the woods for the

43

ideal time to ambush the Serafinos. In fact, Hudach either feigned spraining or actually sprained his ankle and waited in the woods for the other two to commit the crimes. Defendant even had witnesses (McNulty and Hudach) if he chose to go to the police rather than commit the crime.

{¶ 181} Third, the manner in which the crimes were committed belies any suggestion of duress. Defendant stated to police that he and McNulty walked up to the Serafino residence, McNulty armed with a shotgun and defendant armed with a SK assault weapon and a pistol. Defendant informed police that he and McNulty shot their way into the Serafino house through the sliding glass door. As they blasted their way into the house, they saw Serafino lying on the couch and they started shooting at everything. Defendant stated that he and McNulty "chased 'em [Serafino and Mrs. Serafino] down the hall," firing the whole time. After shooting at both Serafinos, defendant stated that he and McNulty exited through the shot-out sliding glass door.

{¶ 182} Finally, at trial, Dripps testified that he never saw Santine threaten defendant, nor did defendant ever express fear to him. "[It was] [m]ore like loyalty." "Jason was more like a tough guy." "Jason was just nuts." Indeed, rather than expressing fear, Koch described defendant as standing up to Santine when defendant would not let Santine throw away his (defendant's) boots, since they belonged to his father. This hardly demonstrates a defendant whose will was overborne.

{¶ 183} The basis of defendant's claim surrounds the fear he expressed while giving his statement to police on the morning after the murder and attempted murder. At the station, defendant was hesitant to talk about Santine during the interview. He did not want to state Santine's name. He even claimed that "what happened last night could very well happen to me."

{¶ 184} Defendant misunderstands the affirmative defense of duress. The duress must occur *before* the crime takes place. The duress must *cause* the criminal

conduct to occur. The only evidence defendant presents is that he was afraid afterward at the police station. Clearly, he should have been afraid then. He had just pointed the finger at Santine. The fact that defendant was worried that the criminals with whom he had associated before the murder would turn on him after he gave a statement implicating them to the police is wholly irrelevant to the inquiry of duress.

{¶ 185} A review of the testimony of witnesses to the criminal plot reveals not a defendant who operated under duress, but a defendant who seemingly enjoyed committing the crimes. Witness Joshua Koch described defendant's mood after the crimes as happy, relaxed, and laughing. Koch testified that defendant stated that after he shot at Serafino a couple of times, he kicked in the bathroom door and Serafino looked up at him, their eyes met, and he (defendant) knew that he (Serafino) was going to die. Serafino, himself, testified that defendant looked directly into his eyes as he shot him in the face. Koch testified that defendant said he went up to Mrs. Serafino and by that time, she was screaming so loud, it was annoying him; so he walked up to her, put his boot on her head, put the .357 Magnum to her head, said, "Die, bitch," and squeezed the trigger. Koch further testified that defendant told him that he got the blood on his boots from stepping on Mrs. Serafino's face.

{¶ 186} The next day, defendant described the crimes to his friend Michael Dripps as, "We stormed the house," "We fucked him up." Koch testified that the day after the crimes he went over to the McNulty apartment and witnessed a conversation between Hudach, Patricia Lawson, Krista Fazenbaker, and defendant, where the defendant picked up a piece of pizza and said, "This just looks just like this bitch's face after we shot her." As defendant described the crimes to Koch, Santine, Hudach and McNulty, he told them that if anybody breathed a word of it,

he would kill "every one of the sons-of-bitches" and told his friends, "Dude, it was just like Natural Born Killers."[1]

{¶ 187} None of these facts comes close to constituting sufficient evidence of duress to find error with the trial court in refusing to instruct the jury on the affirmative defense of duress. Therefore, I respectfully concur.

—————————————

---

1. Natural Born Killers is a 1994 movie directed by Oliver Stone and starring Woody Harrelson, involving exceptionally senseless and graphic violence.