Appellant, Jason Getsy, appeals from a judgment of the Trumbull County Court of Common Pleas dismissing a petition for postconviction relief without an evidentiary hearing. For the reasons that follow, we affirm the judgment of the trial court.
The facts pertinent to this appeal are as follows. On July 17, 1995, appellant was indicted by the Trumbull County Grand Jury on the following five counts: Counts One and Two, aggravated murder in violation of both R.C. 2903.01(A) (B), each count including three death penalty specifications pursuant to R.C.2929.04(A)(2) — (murder for hire), R.C. 2929.04(A)(5) — (purposeful killing or attempt to kill two or more persons), and R.C. 2929.04(A)(7) — (felony murder); Count Three, attempted aggravated murder in violation of R.C. 2903.01(A) and R.C. 2923.02
with a firearm specification pursuant to R.C. 2941.141; Count Four, conspiracy to commit aggravated murder in violation of R.C.2923.01(A)(1) and/or (2); and, Count Five, aggravated burglary in violation of R.C. 2911.11(A)(1) and/or (2) and/or (3) with a firearm specification pursuant to R.C. 2941.141. The indictment stemmed from appellant's alleged involvement in the murder of Ann Serafino and the attempted murder of her son, Charles Serafino, during the early morning hours of July 7, 1995, at the Serafino residence in Trumbull County.
On August 5, 1996, a jury trial commenced on the above charges. During the "guilt" phase of the trial, evidence was presented as to how one John Santine hired three individuals to carryout the murder of his business "partner," Charles Serafino. Sometime in early 1995, Santine attempted to purchase a portion of Charles Serafino's lawn-care business and deposited $2,500 in the business's account. During that same year, Charles Serafino was incarcerated for a probation violation in the Trumbull County Jail. While Charles Serafino was in jail, Santine attempted to take over the lawn-care business resulting in an altercation between Santine and some members of Charles Serafino's family. The Serafinos subsequently filed a civil action against Santine. Charles Serafino was subsequently released from jail on July 6, 1995, and Santine made arrangements with the following three individuals, appellant, Richard McNulty ("McNulty"), and Ben Hudach ("Hudach"), to permanently end his business relationship with Charles Serafino. The state's case against appellant centered on his alleged responsibility for firing the fatal shots that resulted in the death of Ann Serafino.
In his current appeal, appellant does not dispute that he, McNulty, and Hudach carried out a plan to enter the Serafino residence in an effort to kill Charles Serafino. While appellant may dispute how the events were alleged to have unfolded, he acknowledges that he participated in the offense on some level that resulted in the death of Ann Serafino as well as the serious injuries sustained by Charles Serafino during the shooting. However, appellant alleges, in his appeal from the dismissal of his postconviction relief petition, that he was denied the effective assistance of counsel because of trial counsel's presentation of this "pure mitigation case."
Throughout the "guilt" phase of the proceedings against appellant, evidence was presented that Santine continually made threats against individuals and bragged about his mob connections and how he had the police and certain governmental officials in his "pocket." Santine's connections with the police were allegedly confirmed when McNulty attempted to contact the authorities regarding illegal activity by Santine with no response. It was known that Santine shot his own brother and apparently never served any prison time for the incident. Santine was also known to have carried a gun and would allegedly fire his weapon at his "associates" for no apparent reason. Appellant presented evidence in an attempt to establish that his involvement in the shootings were not of his own free will and that his fear of Santine compelled him to participate in the shooting against the Serafinos. As an example, evidence was presented that on the night of the shooting the group first traveled to the Serafino household but did not complete the act using the excuse that they could not find a place to park. Santine was reported to be furious and, while waiving a gun around, eventually drove appellant, McNulty, and Hudach back near the Serafino household himself.
The state presented evidence to counter appellant's claim that he acted under duress or coercion including witnesses who testified to appellant's "tough guy" image and how he bragged to others about his involvement in the Serafino shootings. The jury ultimately returned a verdict of guilty on all five counts of the indictment.
The trial then proceeded to the "penalty" phase where the defense continued to present evidence as to appellant's fear of Santine as well as other evidence in mitigation of a death sentence. Pertinent to this appeal, several family members testified as to appellant's rough upbringing. His mother was involved in a number of violent relationships and was, at one time, beaten so badly she nearly lost an eye. Appellant was present during a number of these beatings and was placed in the position of trying to protect his mother. Appellant was also exposed to firearms at a young age including an incident where drug dealers shot at his home. Appellant developed his own interest in firearms. The firing of weapons was reported to give appellant a feeling of power.
Appellant was also interviewed extensively by a psychologist, Dr. James Eisenberg, who testified during the "penalty" phase of the trial. Dr. Eisenberg's testimony was summarized by the Supreme Court of Ohio during appellant's direct appeal as follows:
 "Dr. James Eisenberg testified that [appellant's] psychological profile confirmed the fact that [appellant] felt trapped by Santine. McNulty's attempts to contact the police with no response reinforced [appellant's] helplessness. According to Dr. Eisenberg, [appellant] was under considerable duress or coercion at the time of the killing. [Appellant] did not feel he could leave, since he felt Santine would take it out on his family. In addition, Dr. Eisenberg stated, Santine had told [appellant] and the others that once they were in, there was no way out. Even shooting Santine was not a solution, since Santine had indicated how well he was connected with the mob and that they would come after [appellant] and his family.
"* * *
 "According to Dr. Eisenberg, [another individual], McNulty, Hudach, and [appellant] were bonded together and `saw each other as kind of the odd man out in their relationships and clung to each other for various reasons.' Dr. Eisenberg stated that while Santine had made threats to all four of the boys [appellant was nineteen years old at the time of the shooting], [appellant] was the most afraid of him. [Appellant's] role in life seemed to be one of protector. He had watched people get abused, like his mother, and stepped in, psychologically, if in no other way, to protect them. He felt particularly protective towards Hudach, since Santine had once fired a gun over Hudach's head. Dr. Eisenberg also testified that [appellant] had seen a lot of violence in his life and had seen threats, that others might discount, actually carried out. For example, his house had been shot at by drug dealers when he was growing up. Dr. Eisenberg also indicated that there was some `group dynamic effect' among Hudach, McNulty, and [appellant]. Dr. Eisenberg believed that none of them individually would have carried out the crime, but only all three together." State v. Getsy (1998), 84 Ohio St.3d 180, 206-208.
 In addition to the above testimony, evidence was presented that appellant's co-defendants, McNulty and Hudach, reached plea agreements with the state and did not face the death penalty. The Supreme Court of Ohio, during appellant's direct appeal, acknowledged that a copy of Santine's sentencing entry, apparently included within the record on appeal, indicated that Santine was found guilty of aggravated murder, attempted aggravated murder, conspiracy to commit aggravated murder, and burglary. However, Santine was not convicted of the capital specifications, and, therefore, could not be sentenced to death. Id. at 208.
Finally, appellant presented to the jury his unsworn statement. Appellant expressed his sorrow and sympathy to the victim's family and explained how he recently experienced the pain of losing a loved one, his mother, who was killed by a drunk driver during the time period he was in jail awaiting trial. Prior to becoming involved with Santine, appellant described how he was trying to better his life working at a job and taking the steps necessary to earn his GED. One day, some of his friends introduced him to Santine who bragged about his connections with the police, government officials, and organized crime. At some point, Santine threatened to kill both appellant and appellant's friends because they had heard too much. Appellant considered going to the police but Santine told him that he had the police "in his pocket," a statement that seemed to be confirmed when the police failed to respond to information supplied by McNulty regarding Santine's illegal activity. Appellant stated that he also did not want to involve his family for fear of reprisals.
On the night of July 6, 1995, appellant recounted how Santine called the group together and ordered them to kill Charles Serafino whom had just been released from jail earlier that day. Appellant stated that he, McNulty, and Hudach were shocked at the request and did not know what to do. They drove toward the Serafino home only to return with the excuse that they could not find a place to park. Appellant described how Santine was furious and screamed at them while waiving a gun in their faces. Santine then drove them back to an area near the Serafino household and then returned home.
Appellant stated that he, McNulty, and Hudach were outside of the victims' home for approximately forty-five minutes pondering what to do. At the time, they felt they had no other choice but to go through with Santine's plan. With hindsight, he realizes that they should have gone back to Santine and told him that he would just have to kill them.
Appellant concluded his unsworn statement by stating that he was unable to sleep the night of the shootings and went to his place of employment the following morning. That same day, he was arrested. He denied ever bragging about the shootings and again expressed his sorrow over the loss of Ann Serafino's life.
Following the conclusion of the "penalty" phase, the jury recommended that the death sentence be imposed. The trial court subsequently adopted this recommendation and sentenced appellant to death. Based on the constitutional change that removed this court from the direct review process, appellant filed a direct appeal with the Supreme Court of Ohio that ultimately affirmed appellant's convictions and sentence of death.
On September 2, 1997, appellant began the collateral attack of his death sentence by filing a timely petition for postconviction relief with the trial court pursuant to R.C.2953.21. Appellant later sought leave to file a supplemental petition for postconviction relief and requested that the trial court provide him with the following materials: copies of any transcripts made in court proceedings with respect to the prosecution of his co-defendants; the supplementation of the record with the records compiled during the prosecution of his co-defendants; and apportionment of funds from which to hire a private investigator as well as other expert assistance. Although the trial court granted appellant leave to file an amended postconviction relief petition, there is no specific ruling concerning his individual requests for expert assistance and the supplementation of the record with the proceedings held during the prosecution of his co-defendants. However, throughout his argumentation in this matter, appellant has requested discovery from which to further support his allegations. The trial court ruled that the power to conduct and compel discovery was not included within its statutory defined authority.
On November 10, 1997, appellant filed an amended petition for postconviction relief pursuant to R.C. 2953.21. Appellant's petition contained the following nine grounds for relief: 1) ineffective assistance of trial counsel during the "guilt" phase of the trial; 2) ineffective assistance of trial counsel during the "mitigation" phase of his trial; 3) state's failure to try the person most responsible for the murder of Ann Serafino, Santine, prior to his own trial resulting in an incomplete picture presented to the jury with respect to the penalties received by his co-defendants; 4) appellant's death sentence is disproportionate to the sentences received by his co-defendants and other death penalty cases; 5) selective prosecution in state seeking the death penalty against appellant while Santine, the person most responsible for the crime, did not receive the maximum sentence; 6) prosecutorial misconduct associated when the jury may have overheard a side-bar conversation when the prosecutor spoke "loudly" with respect to appellant's prior negligent homicide conviction; 7) Ohio's postconviction relief procedure is a meaningless ritual rather that the statutorily mandated process enacted to provide those convicted of a criminal offense with redress for violations of their Constitutional Rights; 8) statements made to the police after compliance with Miranda
warnings were involuntary because appellant was deprived of food, rest, and counsel for an extended period of time; and 9) the trial court erred in denying his motion for a mistrial after the trial judge was arrested during the course of the proceedings for drunk driving after attending a party hosted by one of the prosecutors assigned to his case.
In support of his petition for postconviction relief, appellant submitted a copy of Santine's sentencing entry reflecting that Santine did not receive the death penalty for his organization of the attack that resulted in the death of Ann Seragino. The petition also included an unsigned "affidavit" of Dr. Eisenberg asserting that he did not believe he had an opportunity to fully communicate the information he possessed to the jury based on the lack of time defense counsel spent with regard to his testimony. Specifically, this unsigned "affidavit" alleged that Dr. Eisenberg was not able to discuss the issue of "Obedience to Authority," a theory outlined by Dr. Eisenberg in an attached letter to one of appellant's trial counsel, which might have explained why appellant was unable to resist Santine's commands.
In addition to the above "evidence," appellant submitted a valid affidavit from himself questioning the strategy utilized by his trial counsel in the presentation of evidence during the "penalty" phase. Appellant averred that his attorneys fought over how to prepare for mitigation and that his unsworn statement was prepared with the help of his pastor, not defense counsel who offered no direct guidance and merely reviewed a copy of the finished statement. Appellant further averred that it was a mistake for him to try and "manipulate" the jury during his unsworn statement by telling them about his mother's recent death. Instead, appellant presents a litany of items that he wished he had told the jury personally such as facts regarding his upbringing, including the amount of time he spent in the woods as a child, which he considered his second home, as well as his obsession with guns. He further wished that he had told the jury additional facts regarding the fear that he, McNulty, and Hudach had toward Santine and the way that they were eventually trapped in Santine's criminal activity. Some of the additional information he wished he had told the jury included threats Santine made about "whacking" individuals, Santine's drug use and general unpredictability, and stories of local police and political corruption.
Appellee filed a motion to dismiss appellant's amended postconviction relief petition. The state did not attach any evidentiary materials to its motion, but, instead, argued that appellant failed to present sufficient evidence to warrant a hearing and requested that his petition for postconviction relief be dismissed.
In reviewing appellant's petition, the trial court noted that many of appellant's arguments were previously raised on direct appeal to the Supreme Court of Ohio. Aside from presenting a copy of Santine's sentencing entry in an effort to show that he received a disproportionate sentence as compared to his co-defendants (a claim raised on direct appeal), the trial court noted that appellant failed to present any documentary evidence in support of his claims except for one: specifically, appellant's second claim alleging ineffective assistance of counsel during the "penalty" phase of his trial. However, the trial court discounted appellant's complaints regarding his counsel as nothing more than "Monday morning quarterbacking based on the outcome of the mitigation phase" that were insufficient to establish a claim for ineffective assistance of counsel. Thus, by judgment entry filed July 21, 1998, the trial court granted the state's motion to dismiss appellant's postconviction relief petition. From this judgment, appellant filed a timely notice of appeal and now presents the following seven assignments of error:
 "[1.] The trial court erred to the substantial prejudice of [appellant] by summarily dismissing his post-conviction petition without affording him an evidentiary hearing or allowing discovery.
 "[2.] The trial court erred to the substantial prejudice of the petitioner by dismissing his claim of ineffective assistance of counsel during the mitigation phase of the trial.
 "[3.] The trial court erred by finding claims [1, 5, 8, and 9 in the amended postconviction relief petition were] barred by the doctrine of res judicata.
 "[4.] The trial court erred to the substantial prejudice of the appellant when it dismissed his petition where the complete record was not before the court.
 "[5.] The trial court erred to the substantial prejudice of the appellant by denying relief of the claims relating to the need for discovery, an investigator, a social worker and a psychologist.
 "[6.] The appellant's sentence of death is disproportionate to the sentences of his co-defendants and to other defendants throughout the State of Ohio similarly charged.
 "[7.] Ohio's post-conviction system does not comply with the requirements of due process as guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution."
 In the first assignment of error, appellant argues that the trial court erred in failing to afford him an evidentiary hearing with respect to his claims for relief or, at the very least, allowing for discovery so that he could properly develop the arguments he raised in his petition for postconviction relief. In a related assignment of error, appellant notes in his second assignment of error the evidence he presented to demonstrate that his trial counsel was ineffective during the presentation of mitigation evidence during the "penalty" phase of his trial.
R.C. 2953.21 provides, in pertinent part:
 "(C) * * * Before granting a hearing on a petition [for postconviction relief], the court shall determine whether there are substantive grounds for relief. In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript.
 "(D) Within ten days after the docketing of the petition, or within any further time that the court may fix for good cause shown, the prosecuting attorney shall respond by answer or motion. Within twenty days from the date the issues are made up, either party may move for summary judgment. The right to summary judgment shall appear on the face of the record.
 "(E) Unless the petition and the files and records of the case show the petitioner is not entitled to relief, the court shall proceed to a prompt hearing on the issues even if a direct appeal of the case is pending."
From the statutory language, it is apparent that a hearing is not required in every postconviction relief proceeding but, rather, is discretionary with the trial court. State v. Strutton
(1988), 62 Ohio App.3d 248, 251. The court must determine whether there are substantive grounds for relief that would warrant a hearing based upon the record and any supporting affidavits and documentary evidence before the court. State v. Guerriero (Sept. 26, 1997), Ashtabula App. No. 96-A-0078, unreported, at 4, citingState v. Jackson (1980), 64 Ohio St.2d 107, 110.
In this case, appellant argues that the affidavits he submitted from himself as well as the "affidavit" of Dr. Eisenberg demonstrate why his counsel was ineffective. Appellant argues that the trial court was required to accept these affidavits as true in determining whether to grant a hearing on his postconviction relief petition. He further notes that the state failed to present any evidence to counter these evidentiary submissions. Appellant submits that the trial court improperly weighed the credibility of the evidence he submitted in support of his ineffective assistance of counsel claim by referring to the affidavits as "self-serving" and an example of "Monday morning quarterbacking."
Appellant's argument was rejected when the Supreme Court of Ohio recently decided the issue of whether a court had to accept as true affidavits attached to a postconviction relief petition. In State v. Calhoun (1999), 86 Ohio St.3d 279, the court held, in reversing a decision from this court, as follows:
 "[I]n reviewing a petition for postconviction relief filed pursuant to R.C. 2953.21, a trial court should give due deference to affidavits sworn to under oath and filed in support of the petition, but may, in the sound exercise of discretion, judge their credibility in determining whether to accept the affidavits as true statements of fact. To hold otherwise would require a hearing for every postconviction relief petition. Because the statute clearly calls for discretion in determining whether to grant a hearing, accepting all supporting affidavits as true is certainly not what the statute intended. `[I]f we would allow any open-ended allegation or conclusory statement concerning competency of counsel without a further showing of prejudice to the defendant to automatically mandate a hearing, division (D) of R.C. 2953.21 would be effectively negated and useless.' [State v.] Jackson [(1980)], 64 Ohio St.2d 107
112, * * *.
 "Unlike the summary judgment procedure in civil cases, in postconviction relief proceedings, the trial court has presumably been presented with evidence sufficient to support the original entry of conviction, or with a recitation of facts attendant to an entry of a guilty or no-contest plea. The trial court may, under appropriate circumstances in postconviction relief proceedings, deem affidavit testimony to lack credibility without first observing or examining the affiant. That conclusion is supported by common sense, the interests of eliminating delay and unnecessary expense, and furthering the expeditious administration of justice. See Civ.R. 1(B) and 1(C); [State v.] Cole [(1982)], 2 Ohio St.3d [112], 114, * * *. (`[T]he allegations outside the record upon which appellant relies appear so contrived, when measured against the overwhelming evidence in the record of trial counsel's competence, as to constitute no credible evidence'); Sumner v. Mata (1981), 449 U.S. 539, 545-546, * * * (state appellate court factfinding based on a record review may be adequate to warrant a presumption of correctness in federal habeas corpus proceedings pursuant to former Section 2254[d], Title 28, U.S. Code).
 "An affidavit, being by definition a statement that the affiant has sworn to be truthful, and made under penalty of perjury, should not lightly be deemed false. However, not all affidavits accompanying a postconviction relief petition demonstrate entitlement to an evidentiary hearing, even assuming the truthfulness of their contents. Thus, where a petitioner relies upon affidavit testimony as the basis of entitlement to postconviction relief, and the information in the affidavit, even if true, does not rise to the level of demonstrating a constitutional violation, then the actual truth or falsity of the affidavit is inconsequential. See, generally, State v. Perry
(1967), 10 Ohio St.2d 175, * * *." (Parallel citations omitted.) Id. at 284.
In the present case, we find no error in the trial court's determination that appellant's complaints, with respect to his counsel's performance, do not rise to the level of a constitutional violation. Rather, our review of the record supports the lower court's finding that trial counsel was prepared and presented evidence concerning appellant's upbringing, fear of Santine, as well as other evidence in mitigation on appellant's behalf. While appellant complains that his trial counsel should have prepared more, presented evidence in an alternative manner, and presented new evidence, these complaints are insufficient to counter the "strong presumption that counsel's conduct [fell] within the wide range of reasonable professional assistance[.]"Strickland v. Washington (1984), 466 U.S. 668, 689. It is well established that even debatable trial tactics and strategies do not constitute a denial of effective assistance of counsel. Statev. Clayton (1980), 62 Ohio St.2d 45, 49; State v. Williams (Oct. 16, 1998), Trumbull App. No. 97-T-0153, unreported, at 6.
Within his first assignment of error, appellant also asserts that if the trial court was unwilling to hold a evidentiary hearing to establish the basis of his claims for postconviction relief, the trial court should have provided him with discovery. Appellant claims that he needs discovery in order to fully develop his petition for postconviction relief. However, this court has previously held that R.C. 2953.21 places the burden on the petitioner to make the initial evidentiary presentation containing sufficient operative facts to demonstrate a claim for postconviction relief to merit a hearing. State v. Lorraine (Feb. 23, 1996), Trumbull App. No. 95-T-5196, unreported at 10. Furthermore, the power to conduct and compel discovery is not included within the trial court's statutorily defined authority. Id. Consequently, appellant's first and second assignments of error are without merit.
In the third assignment of error, appellant alleges that the trial court improperly barred the following claims in his postconviction relief petition on the grounds of res judicata: Claim 1, alleging ineffective assistance of trial counsel during the "guilt" phase of his trial; Count 5, selective prosecution based on the state's decision to try him on death penalty specifications before Santine's trial started; Count 8, that statements he made to the police were involuntary; and Count 9, the denial of his motion for a mistrial after alleged impropriety on the part of the trial judge who presided over his case. In a related argument, appellant's sixth assignment of error again raises an issue that was previously raised during his direct appeal. Namely, whether appellant's sentence of death was disproportionate to the sentences received by his co- defendants and other defendants who face similar charges throughout the State of Ohio.
In State v. Perry (1967), 10 Ohio St.2d 175, The Supreme Court of Ohio held:
 "Under the doctrine of res judicata, a final judgment of conviction bars a convicted defendant who was represented by counsel from raising and litigating in any proceeding except an appeal from that judgment, any defense or any claimed lack of due process that was raised or could have been raised by the defendant at the trial, which resulted in that judgment of conviction, or on an appeal from that judgment." Id. at paragraph nine of the syllabus. (emphasis sic.) Accord State v. Reynolds (1997), 79 Ohio St.3d 158, 161.
 Not only could the above assignments of error been raised during his direct appeal, but in actuality, appellant presented each of the above arguments in his third and sixth assignments of error in his argumentation before the Supreme Court of Ohio. Getsy, 84 Ohio St.3d 180, 188, 184-185, 188-189, 203-210. As appellant raised the identical issues on direct appeal that he raises in his third and sixth assignments of error, appellant is precluded from attempting to relitigate these claims in his petition for postconviction relief. Appellant's third and sixth assignments of error are without merit.
In the fourth and fifth assignments of error, appellant alleges that the trial court erred in failing to provide him with discovery, expert assistance, and a copy of the proceedings that occurred during Santine's criminal prosecution. As previously noted in appellant's first assignment of error, R.C. 2953.21
requires the petitioner to make the initial evidentiary presentation sufficient to warrant a hearing on a petition for postconviction relief. There is no statutory authority for the trial court to provide discovery or obtain evidentiary materials to aid a petitioner in the presentation of his petition for postconviction relief. As to the assistance of experts, this court has previously held that the right to expert assistance is linked to the constitutional right to counsel. State v. Williams
(Oct. 16, 1998), Trumbull App. No. 97-T-0153, unreported, at 9. Because postconviction relief proceedings are civil in nature, a petitioner has no corresponding right to expert assistance. However, when and if a trial court grants a hearing on a petitioner's postconviction relief petition, a statutory right to legal representation and assistance of experts may occur. Id.
In this case, appellant failed to submit sufficient evidentiary material to warrant a hearing and, thus, has no right to discovery or expert assistance. Appellant's fourth and fifth assignments of error are without merit.
In the seventh and final assignment of error, appellant alleges that Ohio's postconviction relief procedures fail to provide an individual with any meaningful opportunity to redress a wrongful conviction. In support of his argument, appellant attempts to present statistics as to the low number of petitioners that have been granted postconviction relief in death penalty cases.
This court has previously addressed and rejected a similar claim in State v. Wiles (Apr. 10, 1998), Portage App. No. 97-P-0028, unreported. In Wiles, this court held that an argument regarding the efficacy of Ohio's postconviction relief system was "designed to be made in an original action for habeas corpus and [had] no place in a direct appeal from the dismissal of a petition for postconviction relief." Id. at 10. Consequently, appellant's seventh assignment of error is without merit.
Based on the foregoing, the judgment of the trial court is affirmed.
 __________________________________ JUDGE WILLIAM M. O'NEILL
FORD, P.J., CACIOPPO, J., Ret., Ninth Appellate District, sitting by assignment, concur.