OPINION
Eugene Flowers, defendant-appellant, appeals the judgment of the Franklin County Court of Common Pleas, wherein the court found him guilty for having received stolen property, in violation of R.C. 2913.51, a fourth-degree felony.
Appellant had been employed by Unico Alloys ("Unico"), which recycles high-temperature metals, as a titanium sorter for five years. On June 2, 1999, Howard Schlezinger, the CEO of Unico, purchased approximately 6,800 pounds of molybdenum ("moly") at $6 per pound. Moly is a rare metal used to strengthen steel and make furnaces. In August 1999, Unico sold approximately 3,000 pounds of the moly to a New York company. The remaining moly was stored in three or four fifty-five gallon drums. The moly was supposed to be stored in a locked cage at the Unico plant, but for reasons unknown, was left outside the cage. On September 7, 1999, a company contacted Unico to buy some moly, and Schlezinger asked David Hutchison, the plant manager, to check their inventory. Hutchison informed Schlezinger that the remaining moly was missing.
After some investigation, Schlezinger concluded that the moly was not disposed of in an unrecorded sale and that there had been no breaches in the alarm system. He called other scrap dealers and was eventually told by one dealer that 3,000 pounds of moly had been purchased by Ace Iron 
Metal ("Ace"). After contacting Ace, Schlezinger discovered Ace had purchased a small amount of moly from one its "regular customers" at $1.55 per pound on August 2, 1999, and then two larger amounts on August 7, 1999, and August 14, 1999. Ace then resold it to two Cleveland companies. The two companies confirmed they bought moly from Ace, but Schlezinger did not request that the moly be returned.
Schlezinger further discovered that when the "regular customer" arrived at Ace with the metal, he was accompanied by an African-American man who drove a dark truck. During the August 7 and 14, 1999 transactions, Charles Martin, who worked for Ace, wrote the license plate number of the truck on the scale receipts. August 7 and 14, 1999, were Saturdays, and appellant worked both mornings at Unico with approximately three to six other employees. The license plate number was the same as the one on a black truck owned by appellant, who is African-American. In September 1999, Martin was shown a photographic array by a detective with the Columbus Police Department and picked appellant's photograph from the array as the driver of the truck.On October 26, 1999, appellant was indicted for receiving stolen property. A trial began on September 21, 2000, but the judge declared a mistrial and recused himself. The case was transferred to another judge, and a second trial commenced before a jury beginning May 11, 2001. Schlezinger, Hutchison, and Martin testified on behalf of the state. The defense called as witnesses appellant, Sandra Flowers, appellant's wife, Martin, Columbus Police Department Detective Eric Williams, William Flowers, appellant's brother, and Todd Caudill, an investigator for the Franklin County Public Defender's office. Appellant testified that his black truck did not run at the time of the incidents and that after work both Saturdays in question, he played dominoes with his brothers the rest of the afternoon. He insisted the testimony that his truck had been at Ace was a lie, and that he was being framed.
During the second day of jury deliberations, the jury advised the court that it was at an impasse. The court gave supplemental jury instructions and directed the jury to continue deliberating. The following day the jury returned a verdict of guilty. A sentencing hearing was later held, and the court sentenced appellant to eleven months incarceration. In lieu of imprisonment, the court imposed community control sanctions and ordered appellant to pay court costs and restitution. Appellant appeals the judgment, asserting the following four assignments of error:
First Assignment of Error
 Appellant's right to due process of law under the Fourteenth Amendment to the United States Constitution was violated by his conviction for the offense of receiving stolen property when the evidence was insufficient to prove beyond a reasonable doubt that Appellant received or disposed of property of Unico Alloys or that the value of the property was $5,000 or more.
Second Assignment of Error
 The weight of the evidence does not support Appellant's conviction for receiving stolen property.
Third Assignment of Error
 Appellant was denied his Sixth Amendment right to a fair and impartial jury and his Fourteenth Amendment right to due process of law when the trial court, after the jury reported that it was at an impasse, delivered jury instructions which urged the jurors to reach a verdict but did not admonish the jurors not to surrender their honest convictions as to the weight of the evidence solely because of the opinions of other jurors.
Fourth Assignment of Error
 Appellant was denied his Sixth Amendment right to the effective assistance of counsel by counsel's failure to object to the supplemental jury instruction.
Appellant argues in his first assignment of error that there was insufficient evidence to find beyond a reasonable doubt that he either received or disposed of property belonging to Unico or that the property was valued at $5,000 or more. In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. Id., at paragraph two of the syllabus. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Id.
Appellant was found guilty of receiving stolen property. R.C. 2913.51
provides:
 (A) No person shall receive, retain, or dispose of property of another knowing or having reasonable cause to believe that the property has been obtained through commission of a theft offense.
* * *
 (C) Whoever violates this section is guilty of receiving stolen property. * * * If the property involved is a motor vehicle, as defined in section 4501.01 of the Revised Code, if the property involved is a dangerous drug, as defined in section 4729.01 of the Revised Code, if the value of the property involved is five thousand dollars or more and is less than one hundred thousand dollars, or if the property involved is a firearm or dangerous ordnance, as defined in section 2923.11 of the Revised Code, receiving stolen property is a felony of the fourth degree. * * *
For the purposes of his argument under this assignment of error, appellant assumes, arguendo, that even if the state proved that: (1) some quantity of moly was stolen from Unico; (2) appellant drove a truck to Ace on August 7 and 14, 1999; (3) the truck appellant was driving was loaded with moly; and (4) appellant accompanied a regular Ace customer and that Ace customer sold the moly to Ace for $1.55 per pound, the prosecution did not prove beyond a reasonable doubt that the drums of moly purchased by Ace were the stolen property of Unico or that such property was valued in excess of $5,000.
With regard to the argument that the state did not prove beyond a reasonable doubt that the drums of moly purchased by Ace were the stolen property of Unico, we disagree. An offense's elements may be established by direct evidence, circumstantial evidence, or both. See State v. Durr (1991), 58 Ohio St.3d 86. Circumstantial and direct evidence are of equal evidentiary value. See Jenks, supra, at 272 (circumstantial evidence and direct evidence inherently possess the same probative value and in some instances certain facts can only be established by circumstantial evidence). When reviewing the value of circumstantial evidence, we note that the weight accorded an inference is fact dependent and can be disregarded as speculative only if reasonable minds can come to the conclusion that the inference is not supported by the evidence. Donaldson v. N. Trading Co. (1992), 82 Ohio App.3d 476, 483.
Based upon our review of the record in the case at bar, we believe the jury had before it sufficient evidence from which to conclude, beyond a reasonable doubt, that the moly purchased by Ace was the moly stolen from Unico. The testimony at trial presented substantial circumstantial and direct evidence that, when combined, demonstrated that the moly sold to Ace was the moly stolen from Unico. Schlezinger testified that moly is a very unique and uncommon substance, and he did not know where to find any in Ohio. He stated he did not know of any other plants or companies in Ohio that dealt with moly. He had purchased 6,800 pounds on June 2, 1999, and after he sold 3,000 pounds on August 6, 1999, the remaining moly was still on the premises in an unsecured area. Neither the perimeter alarm nor noise detection alarm were ever triggered during the time in question; thus, the moly was taken by somebody during working hours. Schlezinger testified that he checked to make certain the company had not misplaced or accidentally sold the remaining moly. Both the moly stolen from Unico and the moly sold to Ace were packaged in drums. Schlezinger testified that appellant worked in an adjoining area of the plant where the moly was stored and had full access to the area. He also testified he "knew" the moly that was sold to Ace was the moly stolen from Unico.
Martin testified that around ten or eleven in the morning on August 7, 1999, a "regular customer" came to Ace in a black pickup, which he testified had been driven by an African-American in his forties. Appellant is an African-American, and he testified that he owned a black Chevrolet half-ton pickup truck at the time of the incidents. Martin stated that he paid the men $1.55 for 1,575 pounds of moly. He also wrote down the license plate of the truck on the scale receipt. Appellant admitted that the license plate number written on the receipt was the same one that was on his truck. Again, on August 14, Martin paid $1.55 for 1,404 pounds of moly and wrote the same license plate number on the receipt. Martin testified that when he was later asked to identify the driver of the truck from a photo array, he identified appellant's picture.
Hutchison testified that the drums could only be moved with a forklift, and appellant admitted at trial that he knew how to operate a forklift. Hutchison testified that the plant is very big four hundred rooms so it would have been easy for somebody on a Saturday to move the moly to the loading dock with a forklift. He stated that although there were only a few workers there on the two Saturdays in question, he tends to his own work and does not constantly supervise the other employees. He also testified that on Saturdays, the employees park in the loading dock. Appellant testified that on August 7 and 14, 1999, he parked inside the gate near the loading dock, and that he drove his red Escort. Hutchison stated that he knew appellant drove a black truck to work sometimes. Hutchison also testified that on prior occasions, appellant had left the premises after clocking in and then came back later and clocked out at the end of his shift. He testified that the low purchase price of $1.55 makes him believe the moly was stolen.
Construing the evidence above most strongly in favor of the state, as we are required to do in conducting a review of an insufficient evidence argument, any rational trier of fact could have found that the moly sold to Ace was the same moly stolen from Unico. The rarity of the metal and the similarity of the amount stolen from Unico and sold to Ace could have led a rational juror to believe the moly was the same. Appellant also had access to the moly, the knowledge to operate the machinery required to move the moly, and sufficient opportunity to load it into a vehicle at the loading dock. Further, the license plate number of the truck carrying the moly matched that of appellant's truck, and appellant was identified from a photographic array as the driver of the truck. Therefore, we find the jury's determination was supported by sufficient evidence on this issue.
Appellant also argues there was insufficient evidence to demonstrate that the value of the moly was equal to or greater than $5,000. We disagree. Schlezinger testified that he paid $6 per pound for the moly. There was sufficient evidence that the $1.55 per pound paid by Ace for the material was far below market value. Schlezinger testified that $1.55 per pound was way below market value, and if he could buy moly at that price, he would do it "[a]ll day long." Further, Hutchison testified that moly sells for approximately $10 to $20 per pound. He stated that $1.55 per pound is too low of a price at which to buy moly. He said the only way the price could be that low was if the material had been stolen. The moly bought by Ace totaled 2,979 pounds. Thus, using the $6 per pound value testified to by Schlezinger, the total value of the moly was far above $5,000. Even using the $2.25 figure Martin claimed was the market price of moly at the time of the incident, the total value would be in excess of $5,000. Therefore, construing this evidence in favor of the state, we find that any rational trier of fact could have found that the value of the moly stolen from Unico was in excess of $5,000. Appellant's first assignment of error is overruled.
Appellant argues in his second assignment of error that the jury's verdict was against the manifest weight of the evidence. The weight of the evidence concerns the inclination of the greater amount of credible evidence offered in a trial to support one side of the issue rather than the other. State v. Gray (Mar. 28, 2000), Franklin App. No. 99AP-666, unreported. In order for a court of appeals to reverse the judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the factfinder's resolution of the conflicting testimony. State v. Thompkins (1997), 78 Ohio St.3d 380, 387. Whether a criminal conviction is against the manifest weight of the evidence "requires an examination of the entire record and a determination of whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction." State v. Getsy (1998), 84 Ohio St.3d 180, 193.
In a manifest weight of the evidence review, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Thompkins, supra. "The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387, quoting State v. Martin (1983), 20 Ohio App.3d 172, 175. "The weight to be given the evidence and the credibility of the witnesses are primarily issues to be decided by the trier of fact." State v. Burdine-Justice (1998), 125 Ohio App.3d 707, 716. The trier of fact has the benefit of seeing and hearing the witnesses testify and is in the best position to determine the facts of the case. In re Good (1997),118 Ohio App.3d 371, 377.
In his second assignment of error, appellant basically attacks the credibility of one crucial witness, Charles Martin. He asserts that without Martin's testimony, the testimony of Schlezinger and Hutchison portrays an unlikely fact scenario as to how appellant could have stolen the moly. He points out several problems with the state's theory. Schlezinger and Hutchison agreed that appellant never worked with moly. There was also no evidence that appellant knew the value of the moly or that the drums outside of the locked cage were filled with moly. Appellant also asserts that it is highly improbable that, on two consecutive Saturdays, he could have taken a forklift, gone to the area of the moly, picked up the drums of moly, driven the forklift through the plant, deposited the 1,500 pounds of moly into his thirteen-year-old half-ton pickup truck, and driven away, without being seen by anyone. Appellant also points to the testimony of his wife and brother that his truck was inoperative in August 1999, which was buttressed by the fact that he bought a red Ford Escort from a Unico employee sometime prior to the incidents. Appellant further argues that it is improbable he could have left work, waited in a long line at Ace to sell the moly, and then returned to Unico without anyone noticing he was gone. Because there is no direct evidence to support these scenarios, appellant attacks the credibility of Martin, who presented the most damaging evidence.
Martin's testimony provided two critical pieces of evidence. Martin testified he wrote down the license plate number of the black truck on two scale receipts. He also picked appellant from a photographic array. Appellant contends there are several reasons to question the credibility of Martin. Appellant found it incredible that Martin stated he had never heard of Unico and did not know it dealt with moly, though he had been working at Ace for more than twenty years. Martin also testified that he had no original documents regarding the moly purchases on August 7 and 14 because he gave the originals to a police officer or investigator, despite the fact that Detective Williams stated he was the only detective on the case and never got any documents from Martin, and despite the fact that the public defender investigator, Caudill, stated he never got any documents from Ace. We agree that several of these facts seem suspicious.
In addition, Martin fails to identify the "regular customer" who actually conducted the moly sales transactions. Martin stated that this "regular customer" had been coming to Ace for years. Martin testified that when a customer sells metal to Ace, the customer fills out a form with his or her name and address on it and gives it to a cashier for payment. There is no explanation in the record as to why Martin could not obtain the name of this "regular customer" from the several years of transactions the customer conducted with Ace.
Appellant asserts that his own explanation regarding the untrustworthy testimony of Martin is more reasonable than the scenario put forth by the state. Appellant testified that he thought Martin and another employee from Unico had framed him. He hypothesized that Martin could have gotten the license plate number of his truck and put it on the scale receipts after going to appellant's home and copying the number from the truck as it sat on the street. He testified that Martin may have done this when five or six suspicious men came to his house in early September and asked him several questions about his truck. He further asserts that Martin was able to pick him from the photographic array because either he was among the men that came to his house asking about the truck, or another Unico employee gave Martin an employment picture of appellant.
Though the veracity of Martin is at issue, we do not believe that the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. Although difficult to speculate, Martin's testimony may have come across as suspicious because he did not want to admit that he knew he was purchasing stolen scrap metal. There is no evidence to suggest he was trying to cover up his own involvement in the actual theft of the moly. Importantly, the jury had the opportunity to view Martin, his demeanor, and his voice inflections, and make its own determination as to his credibility. After reviewing the record and weighing the evidence and all reasonable inferences, we do not believe this is an exceptional case in which the evidence weighs heavily against the conviction. For the foregoing reasons, appellant's second assignment of error is overruled.
Appellant argues in his third assignment of error that he was denied his Sixth Amendment right to a fair and impartial jury and hisFourteenth Amendment right to due process of law when the trial court, after the jury reported that it was at an impasse, delivered jury instructions that urged the jurors to reach a verdict but did not admonish the jurors not to surrender their honest convictions as to the weight of the evidence solely because of the opinions of other jurors. The supplemental jury instruction the trial court gave the jurors was nearly a verbatim restatement of the supplemental jury instruction the Ohio Supreme Court adopted in State v. Howard (1989), 42 Ohio St.3d 18, paragraph two of the syllabus. We decline the invitation to depart from the Ohio Supreme Court's holding in Howard. Therefore, appellant's third assignment of error is overruled.
Appellant argues in his fourth assignment of error that he was denied his Sixth Amendment right to the effective assistance of counsel by counsel's failure to object to the supplemental jury instruction. We found above that the trial court did not err in giving the supplemental jury instruction. Therefore, appellant's argument is without merit, and his fourth assignment of error is overruled.
Accordingly, we overrule appellant's four assignments of error, and affirm the judgment of the Franklin County Court of Common Pleas.
Judgment affirmed.
TYACK, P.J., and BOWMAN, J., concur.