JOURNAL ENTRY AND OPINION
{¶ 1} Montee Warren appeals from a judgment entered by Judge Carolyn B. Friedland after a jury found him guilty of murder[1] and aggravated robbery,[2] each with a firearm specification.[3] He claims the verdict was against the manifest weight of the evidence because the witnesses against him were admittedly intoxicated at the time of the killing, and because they had motives to implicate him in the murder in order to avoid criminal charges against themselves. We affirm.
 {¶ 2} Between the late evening or early morning of April 14-15, 2002, thirty-one-year-old Rayshawn Mosley was killed by a single gunshot to the back of his head. His body was found around 8:00 a.m. on the 15th in the backyard of an apartment building at East 100th Street and Elwell in Cleveland The investigation revealed a pool of blood on a second floor deck in the rear of the building, and blood spots on the steps. That evidence, combined with the fact that Mosley's shirt was bunched up around his chest and his back had a number of scrapes, indicated that his body had been dragged from the deck to the backyard.
 {¶ 3} Three apartments had access to the second floor deck; Warren, then twenty-six years old, his girlfriend, Eunice Riggins, and her three children lived in one; Cassie Herrod and her three children lived in the second; and Brandy Owens and a frequent house guest, her boyfriend, Samuel Peet, occupied the third. Initially none of these residents indicated any knowledge of Mosley's demise.
 {¶ 4} In early June 2002, Detective Henry Veverka returned to the building to speak with Owens, and Peet approached him and said that he had information, but he did not want to talk there. Later, Peet went to the police station and told the Detective that Warren had killed Mosley. In July 2002, Warren was arrested on another charge, and he was questioned about Mosley's death.
 {¶ 5} Initially he claimed that he had not been in his apartment that night, but eventually gave a written statement in which he stated that he had stayed with Riggins that night, they had gone to bed about 11:00 p.m., and slept until Riggins awakened him and said she had heard noises in the back. Warren stated that he refused to get up because "[i]t wasn't my fight," and went back to sleep.
 {¶ 6} After Warren's arrest, the police obtained a written statement from Owens, who corroborated Peet's allegation that Warren had committed the murder. A grand jury returned indictments against Warren, Riggins, and Herrod; Warren was charged with aggravated murder,[4] aggravated robbery, and intimidation,[5] while the women were charged with obstructing justice.[6]
 {¶ 7} The evidence at Warren's trial generally showed that on April 14th, Peet, Owens, Riggins, Warren, and Herrod were drinking, smoking marijuana, and barbecuing together. At some point in the late evening or early the next morning, Mosley came to the building to get drugs from Herrod. He wanted a cigarette dipped in PCP from Herrod but, apparently, was unable or unwilling to pay for it. The building residents knew that Mosley was an alcoholic and a drug abuser, but considered him friendly and likeable, and he had been known to sleep on the first floor's rear deck.
 {¶ 8} At that time, Peet and Warren were together in one apartment, while the three women were in Owens' apartment. Peet testified that Warren heard Mosley outside laughing and talking to himself, and that he said something to the effect that he was tired of having Mosley hanging around. Peet then stated that Warren put on a jacket and a mask that covered his nose and mouth, and left the apartment through the front door. A short time later Peet looked out of the back door and saw Warren on the deck holding a gun to Mosley's head. Peet stated that he went to a different room and, when Warren returned a few minutes later, he told Peet that he loved him "like a little brother[,]", but warned him that "you better not say anything because I'll have to do you, too." Peet said that Warren, Riggins, and Herrod all wanted him to help in moving Mosley's body, but he refused.
 {¶ 9} Owens testified that she heard noises from the deck, that she went out to investigate and saw a man with a mask and a gun standing or crouching over another man. Despite the mask, she recognized Warren, but when she saw the gun she went back inside and slammed the door. She claimed that she told Riggins and Herrod what she had seen, but they dismissed her as intoxicated. She testified that about twenty minutes later Herrod left through the back door and, after that, Peet entered through the back door. She described him as "frantic," and said that he told her Warren had killed Mosley.
 {¶ 10} Riggins, who admitted she was testifying because she hoped for leniency on her own charge of obstructing justice, admitted that she was drinking and smoking marijuana in Owens' apartment, and that Owens went to the back door because she heard noises, and that she slammed the door shut and told her that people were fighting outside. Riggins stated that when she went to her own apartment later, Warren admitted to her that he had shot Mosley while trying to rob him, but had not intended to. Warren claimed that Herrod told him that Mosley had money because his employer paid him in cash weekly, and he also stated that he had gotten the gun from her. Riggins stated that Warren asked Peet to help him move the body, but Peet refused, and Warren dragged the body down the steps by himself.
 {¶ 11} Peet and Riggins both testified that they had not come forward initially because they feared Warren, and Riggins also feared Herrod's retaliation. Owens testified that she was afraid "somebody was going to come to my house[,]" although she was not more specific.
 {¶ 12} On cross-examination, Warren established that all three witnesses had been drinking and smoking marijuana throughout the day of April 14, 2002, and that Herrod had PCP available, although all three witnesses denied using PCP that night. He also showed, through cross-examination, that Riggins had consistently denied his involvement prior to her own indictment, and that Peet had a pending community control violation proceeding.
 {¶ 13} Warren was acquitted on the charges of aggravated murder and intimidation, but found guilty of the lesser included offense of murder, guilty of aggravated robbery, and guilty of the firearm specification with respect to both charges. He was sentenced to an indeterminate sentence of fifteen years to life for the murder, a concurrent seven-year prison term for the aggravated robbery, and three-year prison terms for each of the firearm specifications, which were to be served concurrent to each other, but consecutive to the prison terms for the underlying offenses, for a total prison sentence of eighteen years to life.
 {¶ 14} Warren's single assignment of error states:
{¶ 15} The verdicts are against the weight of the evidence.
 {¶ 16} When reviewing a challenge to the weight of the evidence, we review the entire record and assess the credibility of witnesses, the quality of evidence, and the inferences that can reasonably be drawn from the evidence,[7] in order to determine "whether the evidence produced attains the high degree of probative force and certainty required of a criminal conviction."[8] Manifest weight review allows the reviewing court to act as a thirteenth juror, and to remand for a new trial if it appears that the jury misconstrued the evidence, drew unreasonable inferences, or otherwise "lost its way" in rendering its verdict.[9] Under the manifest weight test, a new trial should not be ordered unless the evidence weighs so heavily against conviction that the verdict appears unjust.[10]
While this is a stringent standard, a reviewing court is not required to "defer" to a jury's factual determinations. If our broad review of the record shows that the jury's conclusion was reasonable, the verdict will be affirmed as not against the weight of the evidence. If, however, the verdict is based on evidence that lacks credibility or upon unreasonable inferences, it must be remanded for a new trial.
 {¶ 17} Warren claims the jury's verdict is unreasonable because the testimony of Owens, Peet, and Riggins was unworthy of belief. He notes that none of them came forward initially to claim that he had committed the murder, that both Peet and Riggins admitted having pending criminal actions against them, and that Riggins admitted that she hoped her testimony would help her get favorable treatment. He also points out that Riggins' testimony contradicted her previous oral and written statements to police; she first stated that he was not in the apartment that night, and then amended her story to state that, although he was in the apartment, he was in bed with her when she heard suspicious noises outside. He attacks Peet's testimony as unworthy of belief because it was inconsistent with his statements to police, and he argues that all the witnesses are suspect because they were admittedly intoxicated on alcohol and marijuana, and possibly on PCP.
 {¶ 18} Through cross-examination of the State's witnesses, Warren tried to cast doubt on many areas of the State's case, but his primary efforts were aimed at showing that he had been misidentified as the murderer, whether accidentally or deliberately.[11] Among other things, he suggested that there were other figures in the neighborhood capable of killing Mosley, and that police initially received a tip that one of those persons, Natuan Williams, was the murderer. Detective Veverka stated that he eliminated Williams as a suspect after the informant admitted making up the story.
 {¶ 19} Warren cast suspicion on Peet, who claimed that he did not go onto the deck after Mosley was murdered, even though both Owens and Riggins testified that he used the deck to go between the two apartments after the shooting. He also tried to show that Riggins had a reason to protect Peet, and that she was testifying against him to save her job and her state nursing assistant's license because, if she was convicted of a felony, it would be revoked.
 {¶ 20} Warren is correct in asserting that Owens, Peet, and Riggins each have credibility problems from their admitted states of intoxication, their motives for testifying, and various inconsistencies in their testimony and their statements to police. Their combined testimony leaves an unclear picture about the time of the murder, its motive, and the exact details of each individual's comings and goings. Despite the inconsistencies, however, their testimony does create a relatively coherent, consistent story with respect to certain crucial facts: Both Peet and Owens testified to seeing Warren, armed, on the deck with Mosley just before his death, and both Peet and Riggins agree that Warren sought Peet's help in moving the body shortly after the murder, but Peet refused. Moreover, Riggins testified that Warren admitted killing Mosley during a robbery attempt, and Owens testified that Peet, while in a "frantic" state shortly after the murder, told her that Warren had killed Mosley.
 {¶ 21} While it is true that none of the witnesses initially came forward to accuse Warren, Peet and Riggins testified that they feared retribution from Warren if they did so. Peet stated that Warren threatened to kill him if he did not keep silent, Owens and Peet both testified that he asked about their encounters with police, and Riggins testified that he instructed her what to tell the police. This testimony provides a reasonable explanation for the witnesses' delays in coming forward.
 {¶ 22} We also agree that, although Peet and Riggins had reasons to cooperate with police by testifying against Warren, he has not shown that the jury was unreasonable in believing their testimony. Riggins had compelling reason to testify, because a felony conviction would jeopardize her job, her career, and, possibly, custody of her children. At the time of trial, Peet was facing sanctions for violating the conditions of community control imposed as a result of his guilty plea on drug trafficking charges. However, both of them testified that Warren committed the murder, and Warren has not shown why both witnesses would falsely accuse him of the murder in order to gain advantage in their own cases. Although he attempted to show that Riggins was seeking to protect Peet, there is little support in the witnesses' testimony that it was Peet, rather than Warren, who committed the crimes.
 {¶ 23} Although Peet denied that he was "frantic," and that he was crying after the incident, Riggins testified that Warren was berating him and calling him a "wimp" for refusing to help move the body, and that Peet was upset and crying. None of the witnesses suggested that Peet committed the murder, or was even complicit in it, and the jury reasonably could have rejected Warren's attempt to cast suspicion on Peet. Furthermore, while Warren also tried to cast suspicion on other neighborhood characters, the evidence of other suspects was not so strong that the jury's determination was rendered unreasonable.[12]
 {¶ 24} All three witnesses who testified to knowledge of Warren's guilt had been drinking and using marijuana, and at least two of them had legal issues of their own that they hoped to mitigate by cooperating in Warren's prosecution. Nevertheless, each gave testimony that was consistent enough to be believed, and the jury was reasonable in accepting that testimony over the alternatives offered.
 {¶ 25} The reliability of the three witnesses' testimony is enhanced by the evidence that Warren initially lied about his presence at the apartment on the night of the murder, and that he then claimed that he and Riggins were in bed when the incident occurred. Although Warren attacks Riggins' credibility by pointing to her prior statements, those statements reasonably support her testimony that Warren instructed her on what to tell police.
 {¶ 26} Riggins also claimed, initially, that Warren was not present at the time of the killing, and then claimed that he was present, but that the couple was asleep at the time noises were heard outside. The jury reasonably could have determined that this evidence did not damage Riggins' credibility, but showed that her initial statements to police were influenced by Warren's instructions. Therefore, the evidence is consistent and sensible enough to support the jury's conclusions that Owens, Peet, and Riggins were believable when they stated that Warren killed Mosley.[13] The assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Cuyahoga County Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Cooney, J., and Rocco, J., Concur.
[1] R.C. 2903.02.
[2] R.C. 2911.01.
[3] R.C. 2941.145.
[4] R.C. 2903.01.
[5] R.C. 2921.04.
[6] R.C. 2921.32.
[7] State v. Lindsey, 87 Ohio St.3d 479, 483, 2000-Ohio-465,721 N.E.2d 995.
[8] State v. Getsy, 84 Ohio St.3d 180, 193, 1998-Ohio-533,702 N.E.2d 866.
[9] Lindsey, supra (citation omitted).
[10] Id.
[11] Because Warren's arguments attack his identification, we find it unnecessary to separately address the existence of each element of the offenses charged — we view Warren's argument as conceding that there is sufficient and substantial evidence that someone committed a murder and aggravated robbery, and he only disputes the quality of the evidence identifying him as the murderer and robber.
[12] See, e.g., Lindsey, 87 Ohio St.3d at 484 (evidence of other suspects was weak, and substantial evidence implicated the defendant).
[13] With respect to the standard of review, we again note that we have not "deferred" to the jury's conclusions in this respect, but we have only determined that the evidence was substantial and credible enough to support such a conclusion and, therefore, that the jury's verdict is not against the manifest weight of the evidence.